[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1035 
Joyce Daniels, Katherine Daniels, Lillie Cook Daniels, Vellica Daniels Osborne, Jesse J. Cook, and Sharita Daniels, all of whom were plaintiffs in an action against East Alabama Paving, Inc. ("EAPI"), appeal from a post-trial order entered in that case. EAPI cross appeals. We affirm in part, reverse in part, and remand.
The case arose out of a single-vehicle accident that occurred on Interstate Highway 85 in Macon County, on November 24, 1993, at approximately 8:30 p.m. It involved 10 members of the Daniels family — Joyce Daniels, Stephanie Nicole Daniels-Howard, Katherine Daniels, Lillie Cook Daniels, Vellica Daniels Osborne, Jesse J. Cook, Juan E. Daniels, Sharita Daniels, Arleisha Daniels, and Sirenthia Daniels ("the Danielses").
At issue is a several-inch elevation or drop-off the plaintiffs allege existed on I-85 between the traveling lane and the emergency lane and/or shoulder. At the time of the accident, EAPI had a contract with the Alabama Department of Transportation ("ADOT") to resurface a portion of I-85, including the portion where the accident occurred. EAPI's contract was standard in the industry and provided that if the difference in elevation between two lanes was two inches or less, the elevation should be rolled and tapered to eliminate a vertical edge. Furthermore, if the elevation exceeded two inches, then under the contract EAPI had a duty either to place various significant warning devices or to close the lane.
The accident occurred when Katherine Daniels, the driver, lost control of the vehicle in which the Danielses were traveling. The vehicle left the roadway and overturned at least twice. Three-year-old Stephanie ("the decedent") was killed and the remaining family members sustained varying injuries.
The Danielses sued EAPI. The gist of their allegation was that EAPI had negligently and/or wantonly created a dangerous and hazardous condition on I-85; that EAPI had negligently and/or wantonly failed to warn against the dangerous and hazardous condition; and that the dangerous and hazardous condition had proximately caused the accident and resulting injuries. Joyce Daniels made an additional claim, alleging the wrongful death of a minor, pursuant to Ala. Code 1975, § 6-5-391.
The case proceeded to trial. The trial court ultimately dismissed Arleisha and Sirenthia as parties. The court entered a judgment as matter of law ("JML) in favor of EAPI on the wantonness count and submitted the wrongful-death claim and the negligence count to the jury. The jury returned a verdict in favor of Joyce Daniels, as administratrix of Stephanie's estate, on the wrongful-death claim, awarding punitive damages of $5,000,000. The jury returned individual verdicts in favor of the Danielses, awarding compensatory damages to each plaintiff who had not been dismissed. The trial court entered a judgment based on the verdicts. *Page 1037 
EAPI moved for a JML, a new trial, or a remittitur. The trial court entered a post-trial order 1) denying EAPI's motion for JML on the negligence count and 2) conditionally granting EAPI's motion for a new trial if the Danielses refused to accept the following remittiturs:
PLAINTIFF AWARD REMITTED TO:
 Joyce, as $5,000,000 $2,000,000 (wrongful death) administratrix of the estate of Stephanie:
 Joyce — $2,500,000 $250,000 (compensatory) individually
Jesse $200,000 $40,000 (compensatory)
Lillie $175,000 $35,000 (compensatory)
Katherine $150,000 $20,000 (compensatory)
Vellica $104,000 $29,000 (compensatory)
Juan $15,000 (no remittitur)
Sharita $10,000 $367 (compensatory)
Joyce, as administratrix of Stephanie's estate, accepted the remittitur of the wrongful-death award; that award and the remittitur are not before this Court on appeal. The trial court did not order a remittitur of Juan's award; that award also is not before this Court on appeal. Joyce (individually), Jesse, Lillie, Katherine, Vellica, and Sharita refused to accept the remittiturs. They contend 1) that the trial court erred in ordering remittiturs of their personal-injury awards and 2) that the trial court erred in entering a JML on their wantonness count, thereby refusing to submit the issue of punitive damages to the jury (except as to the wrongful-death claim). EAPI cross appealed, contending that the evidence was insufficient to support submitting the case to the jury on the issue of negligence or, alternatively, that the trial court should have ordered further reductions of the damages awards.
 I. The Sufficiency of the Evidence as to Negligence and Wantonness
The Danielses contend that the trial court erred in entering a JML in favor of EAPI on the wantonness count, thereby precluding the jury from considering the individual claims for punitive damages. EAPI contends that the trial court erred in not also entering a JML in its favor on the personal-injury claims to the extent those claims were based on a theory of negligence. When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in granting or denying a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala. 1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented substantial evidence to allow the factual issue to be submitted to the jury for resolution.Carter v. Henderson, 598 So.2d 1350 (Ala. 1992). See, also, §12-21-12, Ala. Code 1975, and West v. Founders Life Assurance Co.of Florida, 547 So.2d 870, 871 (Ala. 1989). A motion for JML "is properly denied where there exists any conflict in the evidence for consideration by the jury." Cloverdale Plaza, Inc. v. Cooper Co., 565 So.2d 1147, 1149 (Ala. 1990). In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences from that evidence as the jury would have been free to draw.
 A. Negligence
The Danielses presented evidence in support of their contention that EAPI had created a dangerous condition on I-85 and that EAPI had failed to warn against the condition. As previously noted, any drop-off of two inches or less had to be rolled and *Page 1038 
tapered to prevent a vertical edge. If the drop-off exceeded two inches, additional traffic-control devices were required or, alternatively, the lane should have been closed. Frank Osborne, who is Vellica's husband, went to the accident scene the day after the accident occurred. Osborne testified that he measured the pavement edge and that in various locations it measured three to four inches and appeared "straight up and down." Osborne also took photographs of the accident scene. The Danielses introduced these photographs at trial; they indicated that the pavement edge was vertical and that it exceeded two inches in height. Clifford A. Prosser, a traffic-accident consultant, investigator, and reconstructionist, reviewed certain evidence in the case and opined that the accident was the "classic pavement-edge-drop and oversteer-loss-of-control-type accident." Robert V. Kolar, a consulting engineer, testified that, based on the photographic evidence, he was able to determine that the pavement edge was 3.37 inches high and that it appeared nearly vertical.
EAPI presented evidence in support of its contention that the pavement edge and/or drop-off was in a safe condition when its employees left the work site at the end of the day on which the accident occurred. EAPI offered evidence that there were signs at the beginning and at the end of the construction zone informing drivers that they were entering/exiting a construction zone. William Gray, a project engineer with ADOT, testified that ADOT had the responsibility to make sure that all traffic-control devices, e.g., barrels, low-shoulder signs, etc., were in place and that they complied with plans and specifications incorporated in the Alabama Manual on Uniform Traffic Control Devices. Gray testified that EAPI was responsible for actually placing the traffic-control devices on the roadway at ADOT's instruction, and that ADOT "comes back behind [EAPI] and makes sure that they do their job." Gray further testified that there were no additional traffic-control devices in place at the time of the accident because, he says, ADOT determined that none were necessary. Bennie Dease, an employee of ADOT, testified that on the morning of the day of the accident he had stopped in various spots and measured the pavement edge and that the edge drop-off was two inches or less. Dease testified that he made a notation to this effect in the ADOT diary, which was introduced into evidence. Rex Stroud, a superintendent with EAPI, testified that he routinely walked behind the paving truck and the roller machine and actually observed the pavement edges. He further testified that he had no knowledge that any pavement edge on this particular project had ever exceeded two inches or had not been tapered. Stroud testified that if he had observed a drop-off exceeding two inches, he probably would have closed the lane or put up additional traffic-control devices.
The evidence created a conflict regarding 1) whether the pavement edge and/or drop-off exceeded two inches and 2) whether the pavement edge and/or drop-off had been rolled and tapered. This conflict in the evidence created a jury question, which was resolved in favor of the Danielses. Accordingly, the trial court properly denied EAPI's motion for a JML on the negligence count.
 B. Wantonness
We now consider whether the Danielses produced sufficient evidence to allow the question of wantonness to be submitted to the jury. In Alfa Mut. Ins. Co. v. Roush, 723 So.2d 1250, 1256
(Ala. 1998), *Page 1039 
this Court stated: "To prove wantonness, it is not essential to prove that the defendant entertained a specific design or intent to injure the plaintiff." "Wantonness" is defined by statute as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." Ala. Code 1975, § 6-11-20(b)(3). In Roush, citingBaseman v. Central Bank of the South, 646 So.2d 601 (Ala. 1994), this Court described wantonness as "the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result." 723 So.2d at 1256. In Pitt v. Century II, Inc., 631 So.2d 235 (Ala. 1993), the Court discussed when a wantonness count was properly submitted to a jury:
 "With regard to whether the court should have submitted to the jury the claim for punitive damages under the wantonness count, we note that our review of the [JML] is governed by the `clear and convincing evidence' standard of Ala. Code 1975, § 6-11-20. Section 6-11-20(a) allows an award of punitive damages only `where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice.' Section 6-11-20(b)(4) defines `clear and convincing evidence':
 "`Evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.'"
Id. at 240.
The record is devoid of any clear and convincing evidence of a conscious disregard on the part of EAPI. EAPI offered evidence indicating that additional traffic-control devices were not in place on the day of the accident because, it contended, none were needed. No evidence indicated that EAPI was aware that the pavement edge exceeded two inches. EAPI introduced evidence indicating that the pavement edge had been rolled and tapered. Further, there was no evidence of any reports of similar accidents and/or complaints regarding the area when this accident occurred. Accordingly, the trial court properly granted EAPI's motion for a JML on the wantonness count.
 II. Excessiveness of Damages
We now review the jury's compensatory-damages awards and the trial court's order for remittitur of those awards. The Danielses point out that the trial court in this case concluded that the verdicts were not the result of bias, prejudice, passion, or other improper motive. Accordingly, they contend that the trial court had no authority to interfere with the verdicts and that the verdicts should not be disturbed.
 A. The Trial Court's Order
We quote the trial court's post-trial order in its entirety:
 "This case involves an incident in which one person was killed and seven persons were injured in a one-vehicle accident on Interstate 85 near Tuskegee. The plaintiffs are the mother of the deceased and the various individual plaintiffs who were passengers in the vehicle. The defendant is the contractor who had a contract with the Alabama Department of Transportation to resurface a portion of the interstate in the area. The gist of the action was that the defendant negligently performed its duties under the contract and to the general driving public by failing to provide and construct proper elevations between lanes and between a lane and shoulder, referred to herein as `drop-off,' or failed to provide proper safety precautions, which proximately caused the injuries and the death. This case was tried by this Court over a period of one week, and the Court is familiar with the evidence. The Court eliminated the issue of wantonness as to the individual plaintiffs, and consequently all damages awarded were compensatory. As to the wrongful death claim, the damages are necessarily punitive only.
 "This Court gave the parties the opportunity for a *Page 1040 
full Hammond/Green Oil[1]
hearing, and no evidentiary matters were offered. Since there was nothing submitted or to indicate that the verdicts and judgments would have a devastating effect upon the defendant's financial position, considering insurance, or that criminal sanctions were involved, or that other civil actions had imposed a penalty on the defendant based on the same conduct, or that the cost of litigation was significant, these factors have not been considered. This Court has also considered the BMW v. Gore[2] factors.
 "Defendant East Alabama has filed a post-trial motion for, alternatively, JNOV, new trial or remittitur. It also addresses motions made during the course of trial for directed verdict at the close of the plaintiffs' evidence and at the close of all of the evidence. The Court is aware that all these motions are now referred to as a `Judgment as a Matter of Law.' Out of habit, this Court used old nomenclature.
 "The Court eliminated for consideration by the jury the issue of wantonness, and gave cogent instructions on the issue of negligence. The plaintiffs submitted substantial evidence as to negligence on the part of the defendant. The defendant also argues that the verdict was the result of bias, prejudice, passion, or other improper motive. The jury passed all voir dire, was attentive, exhibited an unbiased view, and apparently decided what juries are chosen to decide.
The fact that this Court does not necessarily agree, on review, with the decision of the jury does not indicate bias, prejudice, passion or other improper motive. There is no reason why the issues should not have been submitted to the jury and no reason why defendant should be granted a new trial. These motions are denied. There was absolutely nothing improper about this trial, except that the verdicts are somewhat excessive on review by this Court.
 "The Court must now turn its attention to the matter of remittitur. The Court must consider as to each individual [plaintiff] whether or not the verdict of the jury was excessive in the light of the evidence and current law, and must analyze each recovery separately.
 "Prior to this individual analysis, the Court makes certain generalized findings which support this decision and order. They apply generally, or more specifically as stated hereinafter. In order to do so, this Court must expound further upon its reasoning.
 "Interstate 85 is a very heavily traveled portion through Macon County. The defendant held a contract to resurface a substantial portion thereof involving Macon County, and entered into a contract with the Alabama Department of Transportation to perform the work. The contract contained some very specific safety provisions, designed for the protection of the public, as well as the basic engineering provisions. The defendant owed a general duty not to negligently injure other persons using the interstate, as well as the contractual duties. Under the contract, which was standard in the industry, if the difference in elevation between a lane and the shoulder or the lane and lane undergoing repair, called `drop-off,' was two inches or less, it should be rolled and *Page 1041 
tapered, meaning it should not be abrupt. If the elevations exceeded two inches, it was the duty of the defendant to place various significant warning devices or close the lane. In this case, there were no significant warning devices and the lane was not closed.
 "In this case, the evidence was contested and controversial. Plaintiff offered evidence that the two-inch drop-off was not rolled and tapered, and also offered evidence that the `drop-off' exceeded two inches. The defendant offered evidence from employees and supervisors, and Department of Transportation's personnel, that the construction was in conformity with the contract. Apparently, the Department of Transportation was satisfied. This created a jury question, which was resolved in favor of the plaintiffs.
 "The verdict of the jury was not improper, and there was substantial evidence presented on the basis of which the jury could have rendered its verdicts. Therefore, the defendant's motion for judgment as a matter of law and for a new trial is due to be denied. A jury could have found that the `drop-off' was not properly rolled and tapered, and/or that the difference in elevation was more than two inches. This leaves the matter of remittitur. The Court will consider it as to each individual plaintiff.
 "Before addressing the Court's determination as to each individual plaintiff, the Court finds certain caveats applicable to most or all, and addresses them collectively and/or individually so that they may not be unnecessarily repeated. They are as follows:
 "1. The result of the awards, even when reduced, certainly remove[s] defendant's profit from this particular job, and probably results in a loss. Considering insurance, there is no evidence that this has a devastating effect on the defendant's financial position. Some verdicts are `windfalls,' and are not justified. As reduced, they are not.
 "2. Because the traveling public was permitted to use this portion of the interstate, there was a great potential for hazard and loss resulting from defendant's actions. The defendant must have been aware of the hazard which its conduct caused or was likely to cause. While the defendant may have believed and offered evidence that it did not create this hazard, and particularly relied upon its personnel and supervisors on the job, as well as the inspectors from the Department of Transportation, the jury could have reasonably concluded from the evidence that the defendant should have been aware of its actions or omissions and disregarded the hazards to the plaintiffs in this case.
 "3. The Court finds that the defendant was simply negligent in the performance of its duty, and did not consciously or intentionally cause the results. While the driver was not contributorily negligent according to the jury, it was very dark, there were indications of construction, the small station wagon was probably overloaded, and a condition existed which a very careful driver might have avoided. This does not excuse the defendant.
 "4. Although our law on seatbelt requirements do not constitute a defense, the deceased child was not in a safety protection, the small station wagon was absolutely full, and the driver was not extremely careful under the circumstances. It is a close question as to whether or not the defendant should have anticipated this situation, which impacts on the degree of reprehensibility. All things considered, the Court believes that the defendant should have been prepared for the worst possibilities considering the number and variety of the traveling public, and failure to do so is reprehensible.
 "The question always becomes, how reprehensible? There is no yardstick. Basically, it becomes for the Court to determine whether or not, under the circumstances, a particular verdict is sufficient punishment and is a sufficient deterrent to the defendant and others to prevent like conduct, or whether it is simply too much considering these goals.
 "5. While this Court does not find that the verdicts were the result of bias, prejudice and passion, or other improper motive, the Court concludes that some of the verdicts were unwarranted based on the evidence, a few were justified, and the Court concludes that it *Page 1042 
would be best to deal with them individually on review rather than a blanket order.
 "6. This Court has reviewed and considered the relationship to harm, reprehensibility, awareness, profit and loss, deterrents, stinging, fair punishment and a comparative analysis of other cases. The results follow.
 "7. The Court has considered an analysis of comparable jury verdicts in cases similar to this one, and has applied this standard. To the extent that this Court finds that any verdict is excessive, the Court further finds that the amount awarded before reduction shocks the conscious [sic] of this Court, and cannot approve it. It is wrong and unjust.
 "8. In almost all instances, the amount of the award vastly exceeds the amount of actual damages so that almost everything awarded is the result of pain and suffering and/or mental anguish. The Court finds little evidence of extensive mental anguish. While it varies with the individual plaintiffs, there was not extensive evidence of substantial, long term physical impairment.
"The plaintiffs, their awards and the actions of the Court are as follows:
 "1. Stephanie Nicole Daniels-Howard, the deceased. The wrongful death claim. Wrongful death is different. It does not lend itself to the same analysis as other punitive damage awards. Nevertheless, certain factors remain. After considering reprehensibility, deterrents, warning to others and the absence of . . . objective guidelines, and after comparing this verdict with others somewhat similarly situated, the Court finds that $2,000,000.00 would be proper and adequate under all circumstances, and the Court would order remittitur to this amount on condition of granting a new trial.
 "Considering insurance, it may not be that this defendant is directly punished by payment of money. However, two million dollars is a lot of money, and it will probably reflect on their loss record. This verdict certainly will be brought to the attention of employees, who will likely be more careful or lose their jobs. Other contractors will hear about it and think it could happen to them. This ought to be a deterrent. While less might be sufficient, this Court doubts it. While more might have greater impact, this Court believes it is overly harsh and unnecessary.
 "2. Sharita Daniels. This plaintiff sustained $367.00 for some nebulous medical treatment and nothing else. The award was $10,000.00. The Court is not aware of any evidence which would justify the award of more than $367.00. Accordingly, this judgment is remitted to $367.00 on condition of new trial.
 "3. Juan Daniels. Juan had medicals of $451.00 and the jury awarded him $15,000.00. He suffered some injury to his knee but suffered no great ill effects. There was some evidence of pain and suffering, and the jury could have concluded that this was a proper award. It will not be reduced, and no remittitur shall be ordered.
 "4. [Vellica] Daniels. [Vellica] sustained property damage of $4,000.00 and other medicals of $2,204.46. The jury awarded her $104,000.00. She was treated after the accident and released. This amount is too much. She had only marginal injuries. She shall agree to a remittitur to $29,000.00 or a new trial will be granted.
 "5. Kathy Daniels. She had $644.60 medical expenses. The jury awarded her $150,000.00. She had some but no serious injuries. There was some pain associated with the injury. She shall agree to a remittitur to $20,000.00 or a new trial will be granted.
 "6. Lillie Daniels. Her special medicals were $225.00. She lost some time from work and had a temporary injury to her shoulder. It was not permanent. The jury awarded her $175,000. 00. This is excessive. She had little pain and suffering, but some. She shall agree to a *Page 1043 
remittitur to $35,000.00 or a new trial will be granted.
 "7. Jesse Cook. Jesse had lacerations about his face and lost some teeth. His medicals were $1,407.84. He testified to mental anguish regarding the fact that the injuries and treatment diminished his appearance in his contact with women. He appeared to be overly vain and sensitive. The jury awarded him $200, 000.00. While this Court might observe that he did not look great before and did not look bad at trial, it cannot determine the effect in terms of his social life, and cannot discount totally the effect. Considering all things, the devastation cannot be worth $200,000.00. Being lenient, the Court reduces his amount to $40,000.00 or a new trial will be granted.
 "8. Joyce Daniels. This verdict is almost absurd. This . . . passenger did suffer some significant physical injury. She has suffered some pain to her shoulder, neck and back, and this has restricted some of her physical activities. She has experienced some pain over a period of time, but no surgery, and none has been recommended. She apparently has dealt with this very well. Most of her complaints had to do with depression, hostility, withdrawal and the like, based on the death of Stephanie. All things considered, her judgment should be reduced to $250,000.00.
 "Remittiturs are ordered as above stated. If the individual plaintiffs do not file consents and acceptance of the remittiturs within fifteen days of this order, new trials are granted as to all plaintiffs who do not consent to remittitur."
(Emphasis in the first ¶ 7 original; all other emphasis added.)
 B. The Standard of Review
In Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986), this Court discussed in detail the law regarding a court's interference with a jury verdict based on excessiveness of damages:
 "The authority to disturb a jury verdict on the ground of excessive damages is one which should be exercised with great caution. . . .
". . . .
 "We begin by recognizing that the right to a trial by jury is a fundamental, constitutionally guaranteed right, Art. I, § 11, Const. of 1901, and, therefore, that a jury verdict may not be set aside unless the verdict is flawed, thereby losing its constitutional protection. It is only in those cases that a trial court, pursuant to [Ala.] R.Civ.P. 59(f), and this Court, pursuant to Code 1975, § 12-22-71, may interfere with a jury verdict. Insofar as damages are concerned, a jury verdict may be flawed in two ways. First, it may include or exclude a sum which is clearly recoverable or not as a matter of law, or which is totally unsupported by the evidence, where there is an exact standard or rule of law that makes the damages legally and mathematically ascertainable at a precise figure. In these situations, a trial court may, and should, reduce or increase the amount of the verdict to reflect the amount to which the parties are entitled as a matter of law. Second, a jury verdict may be flawed because it results, not from the evidence and applicable law, but from bias, passion, prejudice, corruption, or other improper motive. It is this category of cases that most troubles both trial and appellate courts.
 "The cases have consistently held that in deciding whether a jury verdict is excessive because it is the result of passion, bias, corruption, or other improper motive, a trial judge may not substitute his judgment for that of the jury. We have also recognized that the trial judge is better positioned to decide whether the verdict is so flawed. He has the advantage of observing all of the parties to the trial — plaintiff and defendant and their respective attorneys, as well as the jury and its reaction to all of the others. *Page 1044 There are many facets of a trial that can never be captured in a record, so that the appellate courts are at a special disadvantage when they are called upon to review trial court action in this sensitive area, although increasingly they are required to do so. Therefore, it is not only appropriate, but indeed our duty, to require the trial courts to reflect in the record the reasons for interfering with a jury verdict, or refusing to do so, on grounds of excessiveness of the damages.
". . . .
 "In adopting this new procedure [a review procedure set out in the preceding paragraph, a paragraph that is omitted here], we emphasize that no substantial rule of law is changed. A trial court may not conditionally reduce a jury verdict merely because it believes the verdict overcompensates the plaintiff; nor may the trial court substitute its judgment for that of the jury. We also reaffirm those cases which hold that, in considering the adequacy or excessiveness of a verdict, there can be no ironclad rule, and each case must be determined by its own facts."
493 So.2d at 1378-79 (emphasis added) (citations omitted).
We recently, in Kmart Corp. v. Kyles, 723 So.2d 572 (Ala. 1998), modified the review procedure established in Hammond, to add an additional basis upon which a jury verdict may be flawed. We held in Kmart that damages awarded for mental anguish were subject to strict scrutiny if the plaintiff had not suffered any physical injury and offered little or no direct evidence concerning the degree of mental suffering he or she had experienced. That principle established in Kmart does not apply in this case, because the Danielses each suffered physical injuries and experienced varying degrees of pain and suffering. Moreover, each plaintiff presented extensive direct evidence regarding the degree of mental anguish he or she had experienced, either through his or her own testimony or through the testimony of physicians and others who had knowledge of their suffering and anguish.
Under normal circumstances, when a court determines that a particular verdict is excessive, the court necessarily concludes that the verdict resulted from some bias, prejudice, passion, corruption, or improper motive on the part of the jury. The court is then faced with ordering a remittitur, and the question becomes "How much?" There is no yardstick for measuring the proper reduction. In this situation, the court often turns to a comparison of jury verdicts in similar cases for some guidance.
In the absence of a flawed verdict, however, a comparison of jury verdicts in similar cases is not the standard for determining whether a jury verdict should be reduced. The trial court must first determine that the verdict was flawed. As this Court stated in Pitt v. Century II, Inc., supra, 631 So.2d at 239, "a review of a jury verdict for compensatory damages on the ground of excessiveness must focus on the plaintiff (as victim) and ask what the evidence supports in terms of damages suffered by the plaintiff." In the absence of a flawed verdict, "there is no statutory authority to invade the province of the jury in awarding compensatory damages." Id. at 240.
This Court has long held that "[t]here is no fixed standard for ascertainment of compensatory damages recoverable . . . for physical pain and mental suffering" and that "the amount of such [an] award is left to the sound discretion of the jury, subject only to correction by the court for clear abuse or passionate exercise of that discretion." Alabama Power Co. v. Mosley,294 Ala. 394, 401, 318 So.2d 260, 266 (1975). This Court has consistently held that a trial court cannot interfere with a jury verdict merely because it believes the jury gave too little or too much. Williston v. Ard, 611 So.2d 274 (Ala. 1992); Olympia Spav. Johnson, 547 So.2d 80 (Ala. 1989); and Vest v. Gay, 275 Ala. 286,154 So.2d 297 (Ala. 1963). *Page 1045 
 C. Review of the Evidence
The trial court specifically emphasized that the verdicts were not the result of passion, prejudice, bias, or other improper motive. Nonetheless, the trial court determined that some of the verdicts were not warranted by the evidence. Specifically, the trial court noted that the amounts awarded vastly exceeded the monetary amount of actual damage, that the majority of the awards represented damages for pain and suffering and/or mental anguish, and that there was very little evidence of extensive mental anguish and/or long-term substantial or physical impairment. Therefore, the trial court declared, the damages awarded by the jury "shocked" its conscience.
EAPI urges this Court to reverse the trial court's finding that the verdicts were not the result of bias, prejudice, passion, or other improper motive. Jury verdicts are presumed correct, "especially where damages awarded are for pain and suffering."Coca-Cola Bottling Co. v. Parker, 451 So.2d 786, 788 (Ala. 1984). While the trial court is in a better position to decide whether a jury's verdict is the result of bias, passion, or prejudice, a finding of no bias, passion, or prejudice does not relieve this Court of its responsibility to consider whether an award is excessive. Burlington Northern R.R. v. Whitt, 575 So.2d 1011
(Ala. 1990) (punitive damages).
EAPI contends that the mental-anguish testimony presented by the Danielses regarding Stephanie's death was improper and that it tainted the jury's deliberation process. At the time of the accident, three-year-old Stephanie was asleep on her mother's lap. Alando Elwood Hutchinson, the "transport paramedic field supervisor" for Haynes Ambulance Company, who assisted at the scene of the accident, gave this account of the events surrounding the child's death:
 "Q. Tell the ladies and gentlemen exactly what you saw.
". . . .
 "A. First thing that we saw when we got there — well the first thing I saw, because I was on the passenger side of the vehicle, was the little child laying on, kind of her right or left side, facing the interstate itself, and she was covered with coats, and the person with her, with the child, was saying, `Please help this little girl, please help this little girl.' Upon my initial assessment, the child's head was deformed, and the pupils were not reactive, and the child was having what we call agonal-type respiration, which is really not respirations at all. We did an assessment from there on out. I noticed blood around the child's head.
". . . .
 "A. The first thing we did, we tried to maintain access of the airway. . . . We knew right up front that [it] was a head injury. We attempted to ventilate the child. . . . Upon ventilating the child, at that [time] the scalp and facial flesh inflated with the ventilation. So, from that point on we knew we had to load and go.
". . . .
 "A. We placed this child inside the vehicle. I gained access to her airway with the endotracheal tube.
". . . .
 "A. We went to the [Veterans Administration] facility in Tuskegee.
". . . .
 "A. Actually . . . the child arrested [while en route]. The respirations ceased and heart rate ceased. The only thing that had any type of signs of life was what we call agonal rhythm on the heart monitor. . . . It is just electrical activity. . . . We started CPR from there on and we exited out at the VA and they continued from there on out."
We summarize the testimony produced at trial concerning specific injuries incurred by each of the Danielses and the grief each experienced as a result of the accident: *Page 1046 
 Vellica Daniels: (Verdict of $104,000.) Vellica is the aunt of the decedent. Vellica owned the vehicle in which the Danielses were traveling. She sustained property damage of $4,000 as a result of the damaged vehicle. She incurred medical expenses totaling approximately $2,204.60. Vellica testified that on the evening of the accident, she and her family were traveling from Atlanta to her house in Alabama to celebrate Thanksgiving. Vellica testified that in the accident she was knocked unconscious. She testified that she remembered Stephanie's being on the ground and how a doctor (an apparent reference to a paramedic working at the scene of the accident) was trying to save her. She stated that the doctor "had to cut [Stephanie's] throat and put something in there to get her to breathe." Vellica testified that she subsequently fainted and remembered waking up in the ambulance. Vellica was treated in an emergency room for a contusion to her forearm. Vellica testified that she still has "bad pain" in her arm and that the pain has affected her emotionally, because, she says, the doctors cannot do anything for her. Vellica testified that the pain has affected her mentally because, she says, sometimes she cannot play with her children or fix her daughter's hair. Vellica further testified about how she and her children, who were also involved in the accident, often think of Stephanie. Vellica testified that her children often question her about Stephanie's death. Vellica testified that her daughter, Sirenthia, often gets Stephanie's picture out and states, "Momma, I wish it would have been me instead of Stephanie." Vellica testified that her daughter, Arleisha, cries and often asks, "Momma, why did [Stephanie] have to die? Why couldn't it have been us?" Vellica testified that after the accident, she had problems with her son Juan, who was also involved in the accident. She testified about Juan's fear: "`Momma,' he said, `I don't think I am going to make it. I think something is going to happen to me. I think I am going to die.'"
 Sharita Daniels: (Verdict of $10,000.) Sharita, the sister of the decedent, had medical bills that were less than $500. Sharita did not testify at trial, but her mother, Joyce, testified that Sharita blamed herself for Stephanie's death and that Sharita "wished she was the one that had died in the accident."
 Katherine Daniels: (Verdict of $150,000.) Katherine, the aunt of the decedent, was the driver of the vehicle. She incurred $644.60 in medical expenses. Katherine testified that the first thing she remembered after the accident was that people were screaming and trying to get out of the car. Katherine testified that she remembered Joyce telling her "to take care of her baby." Katherine testified that Joyce kept asking her repeatedly if "her baby" was okay. Katherine testified that she did not answer Joyce because she knew Stephanie was unconscious. Katherine testified that her neck and shoulders bothered her for approximately two years after the accident. Katherine testified about the guilt she experienced regarding being the driver of the car and about how she could not attend any family functions because of her guilt. She testified that she had dreams about Stephanie and that she would "see her on the ground like she was that night." Katherine testified that after the accident she sought counseling from the Montgomery Mental Health Authority.
 Lillie Daniels: (Verdict of $175,000.) Lillie is the mother of Joyce, Katherine, Vellica, and Jesse, and the grandmother of the decedent. She incurred medical expenses totaling approximately $225. Lillie suffered a temporary injury to her shoulder and missed three months from work. She testified that her head and back still *Page 1047 
hurt. She further testified that she still has dreams about Stephanie. She testified, "I hear her crying in my sleep and I wake up."
 Jesse Cook: (Verdict of $200,000.) Jesse, the uncle of the decedent, incurred medical expenses totaling approximately $1,407.84. Jesse testified that he suffered abrasions and lacerations around his head and chin, requiring stitches; that he bit his tongue in half, resulting in a speech impediment; and that he lost some teeth — four teeth were cracked and one was chipped. Jesse testified that he could not afford to have these problems with his teeth corrected. Jesse testified that his arm and lower back still bother him, that he still has glass in his head, and that his injuries have diminished his appearance.
 Joyce Daniels: (Verdict of $2,500,000.) Joyce, the mother of the decedent, incurred medical expenses totaling approximately $3,408.63. Joyce testified extensively regarding her account of the accident and the injuries she sustained:
 "[Joyce]: I remember hearing noise. The children were crying. I couldn't see them because my head — I couldn't get it up. The right side of my head was under the window and I was laying down and I couldn't get up. I tried to get it up. I couldn't get it to move. My baby was so quiet. She was so still. And, I remember — I felt something wet all over my arm and I remember bringing it up to me and looking at it. My whole hand was covered in blood. My baby was on the floorboard. She was so still. And, I remember passing her over to Kathy.
"Q. How long were you in the car?
"A. It seemed like forever.
"Q. How did you get out of the car?
"A. They had to cut me out.
"Q. After they cut you out, what did they do next?
 "A. They took me to the trauma unit at East Alabama Medical Center.
". . . .
 "Q. Do you remember how long you were at the emergency room?
"A. I would say quite a while.
 "Q. And, they did [eventually] transfer you to another hospital?
"A. Yes, they did.
"Q. Tell us about that.
 "A. From there I went to UAB [University of Alabama at Birmingham]. . . . I remember being in so much pain and crying out.
"Q. How long were you at the hospital at UAB?
"A. I'm not sure.
". . . .
 "A. I don't know about the treatment. All I can remember is just having that brace on my neck and being on that board and on the bed.
 "Q. When they discharged you, did you continue to have to wear this neck brace?
"A. Yes, I did.
". . . .
"Q. When was Stephanie's funeral?
"A. The following Saturday. That Saturday.
"Q. And, were you able to be there?
"A. Yes, I was.
". . . .
 "Q. I apologize, Joyce, but I have to ask you this question. . . . How has the loss of your daughter affected you?
 "A. For a long time I didn't want to live. I didn't see any reason for living.
 "Q. Take a deep breath. . . . I need you to tell the ladies and gentlemen of the jury some of the feelings and emotions that you have experienced because of your daughter's death. *Page 1048 
 "A. Anxiety, depression, anguish, hostility, withdrawn, that's all I can think of.
 "Q. In the weeks and the months after this accident, would you please tell us how you did physically.
 "A. I was a baby all over again. I had to have everything done for me. I had to be fed. I had to be dressed. I had to be bathed. I had to be put into a car and taken out of a car and put to bed. I had to be taken to the bathroom and they had to pull down my under clothes and come back and pull them up.
"Q. Have you been to a lot of doctors?
"A. Yes.
". . . .
 "Q. I will not belabor the point by taking it month by month, I'm just going to ask you to tell the jury how, physically, you are doing today as far as your neck and your back are concerned.
 "A. My back is almost in constant pain. There is lots of pressure. I feel like there's a catch in my back. . . . It is a lot of numbness, tingling. It feels like somebody's poured ice water on my back at times. It gets real stiff. Shooting pains. Sometimes I have shooting pain in my neck. My neck gets real stiff. At times I feel like it needs to be popped also.
 "Q. How has this condition affected your daily activities?
 "A. At first they affected it a whole lot. And, now it is like, because it is a pain that is almost constant, I will go on most of the time and do what it is that I have to do. A lot of times I'm in so much pain and I start doing some type of household chores like cooking or washing dishes that I have to go lay down for ten or fifteen minutes until the pain stops so I can get up and finish.
". . . .
 "Q. . . . How old was Sharita when this accident happened?
"A. She was a little over nine.
". . . .
 "Q. Would you describe to the ladies and gentlemen of this jury here your relationship, how your relationship was with Sharita before the accident and how — what her relationship was with Stephanie?
 "A. Before the accident Sharita and I, our relationship, it was not perfect. Sharita was very outgoing. She did good in school. She liked going to school. At times she would be rebellious, but we had good days. We spent time together and did things together.
". . . .
 "Q. How — did that change, your relationship with your daughter Sharita, after the accident?
". . . .
 "A. I was so withdrawn. I pushed Sharita away from me. I didn't want to have anything to do with her. I just practically ignored her for a very long time.
 "Q. How did — how did Sharita handle the death of her sister?
 "A. Sharita acted out at home. She got in trouble at school. She started stealing. She started blaming herself and said she wished she was the one that had died in the accident. And, she asked me to make a choice, and if I had to choose, which one would I have rather had lived or died in the accident. She just took it very hard. She regressed to being more of a child."
Ordinarily, in a wrongful-death action, mental suffering of family members is not compensable. James v. Richmond DanvilleR.R., 92 Ala. 231, 9 So. 335 (1890). However, the wrongful-death *Page 1049 
and negligence claims in this case were tried together and, although it was emotionally charged, the evidence regarding the death was highly relevant to the claims of the Danielses, as grief is a form of mental suffering:
 "`When connected with a physical injury, [the term "mental anguish"] includes both the resultant mental sensation of pain and also the accompanying feelings of distress, fright, and anxiety. As an element of damages [it] implies a relatively high degree of mental pain and distress; it is more than mere disappointment, anger, worry, resentment, or embarrassment, although it may include all of these, and it includes mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair and/or public humiliation. . . . [A]s a ground . . . for compensable damages or an element of damages, it includes the mental suffering resulting from the excitation of the more poignant and painful emotions, such as grief, severe disappointment, indignation, wounded pride, shame, public humiliation, despair, etc.'"
Volkswagen of America, Inc. v. Dillard, 579 So.2d 1301, 1306
(Ala. 1991) (quoting Black's Law Dictionary 985-86 (6th ed. 1990)) (emphasis added in Volkswagen; citation omitted). See, also,Wal-Mart Stores, Inc. v. Thompson, [Ms. 1970568, December 18, 1998] 726 So.2d 651 (Ala. 1998). The Danielses produced extensive testimony regarding their physical injuries, their pain and suffering, and the grief that they experienced and continue to experience over the death of Stephanie. As can be seen, the circumstances surrounding their presence at the scene of the death of the three-year-old family member were extremely traumatic and devastating. The Danielses were more than mere bystanders, who have no right of recovery for the trauma of witnessing the death of a family member. See, e.g., Gideon v. Norfolk Southern Corp.,633 So.2d 453 (Ala. 1994). The Danielses, as persons who either were physically injured or were within the zone of danger of the risk of injury, are within the category of persons entitled to recover damages for negligently inflicted mental anguish. SeeAALAR, Ltd. v. Francis, 716 So.2d 1141, 1142 (Ala. 1998). The trial court charged the jury that it could return a verdict that included damages for mental anguish. The trial court gave an additional charge, after overruling in chambers an objection based on the "failure to instruct the jury that mental anguish with emotional distress are not damages and they can't have sympathy for the death of the child or losing a family member." The additional charge stated that "with respect to the claims of the various folks for mental anguish, we are talking about mental anguish arising out of their own injuries and circumstances." (Emphasis added.) The scope of the charge, even as amended by the trial court's additional charge, was sufficiently broad enough to encompass damages for the grief suffered by each of the Danielses. The jury was, therefore, authorized to conclude that Stephanie's death was a traumatic experience for the family members and that it had a direct and lasting emotional impact upon their lives.
While we acknowledge the presumption that the trial judge is in a better position to decide whether a particular verdict has resulted from bias, prejudice, or passion, we must, as a court of review, ask ourselves whether these verdicts shock the conscience of this Court and, if so, whether we may infer the existence of bias, passion, or prejudice notwithstanding the conclusions of the trial court. In Yarbrough v. Mallory, 225 Ala. 579, 144 So. 447
(1932), this Court elaborated on the terms "bias," "passion," "prejudice," and "improper motive":
 "The expression, `passion, prejudice or improper motive,' has become quite a favored one in our decisions.
 "Other cases have added other terms or varied the form of expression, such as `prejudice, passion, partiality, or corruption.' *Page 1050 
". . . .
 "These terms are to be taken in an inclusive sense to safeguard the right of trial by jury, by surrounding the verdict with all reasonable presumptions in its favor. Thus bias, meaning `to incline to one side,' or passion, `moved by the feelings or emotions' . . ., may include `sympathy' as a moving influence; and there need be no `conscious violation of duty.'
 "So it may be said `prejudice' includes forming an opinion `without due knowledge or examination.'
 "Nor is it necessary that the court should inquire and declare what wrongful influence, or failure of duty in the consideration of the case, has wrought a gross miscarriage of justice.
 "For reasons of public policy, the deliberations of the jury cannot be invaded to find what motive or influence worked the mischief. The record may or may not shed light on the subject.
 "The internal evidence, the verdict itself, in the light of the facts clearly disclosed by the evidence, usually furnishes the determining data.
 "Mr. Justice Sayre, dealing with a case where the court sitting as [the factfinder] had rendered a judgment which `must have been the result of inadvertence,' wisely said: `This court deals with results.'"
225 Ala. at 581, 144 So. at 448.
Based upon our review of the record and our consideration of the amounts of these verdicts, we conclude that although they are high in most instances and very, very high with respect to Joyce, we cannot say that this Court's conscience is shocked — but we hasten to add that the verdicts are on the borderline of excessiveness. We thus conclude that, based on this record of evidence dealing with such highly emotional issues, the verdicts were not beyond the outer limits of what a properly functioning jury could award. Given the fact that the trial court found no improper motive on the part of the jury, and the fact there is no fixed standard for determining an award for physical pain and suffering, we conclude that the trial court erred in ordering the remittiturs. Hammond, 493 So.2d 1374.
EAPI contends that it is reasonable to surmise that the jury impermissibly considered punitive factors in its determination of damages. In Consolidated Freightways, Inc. v. Pacheco-Rivera,524 So.2d 346 (Ala. 1988), this Court reviewed the trial court's order requiring remittitur of a jury's verdict in a case involving an automobile accident in which two plaintiffs, a mother and son, were injured and their husband and father was killed. As in this case, the wrongful-death claim was tried together with personal-injury claims. The jury awarded $525,000 in damages on the wrongful-death claim and compensatory damages of $250,000 to the mother and $100,000 to the son. As to the compensatory-damages awards, the trial court ordered remittiturs of $150,000 and $85,000, respectively. The trial court found that the jury's verdict was flawed, not because of bias, passion, prejudice, or other improper motive, but, instead, because it "resulted from misapplication of the law, misunderstanding of the law, mistake or failure to comprehend or appreciate the awarding of compensatory damages as opposed to punitive damages." Id. at 352. This Court held that the trial court's orders of remittitur were not palpably wrong.
This present case is distinguishable. First, the trial court in this case did not find, as did the trial court in ConsolidatedFreightways, that the jury misapplied or misunderstood the law. To the contrary, the trial court found that the jury "passed all voir dire, was attentive, exhibited an unbiased view, and apparently decided what juries are chosen to decide." Second,Consolidated Freightways contains no discussion whatever regarding the plaintiffs' grief as an element of their mental anguish. Finally, there is no evidence in the record of the case *Page 1051 
now before us to indicate that the jury was unable to comprehend or to appreciate the difference between the award of punitive damages it was asked to make on the wrongful-death claim and the awards of compensatory damages it was asked to make on the plaintiffs' personal-injury claims. We do not have in the record a transcription of the full closing arguments of the parties. Sidebar conferences regarding objections made during closing arguments are transcribed, however, and we note that none of the objections relates to any argument concerning recoverability of punitive damages. The trial court adequately charged the jury regarding the difference between an award of punitive damages and an award of compensatory damages; therefore, there is no basis upon which we can infer that the jury misunderstood or misapplied the law.
The Danielses also contend that the trial court's reasons for ordering the remittiturs were based on an improper analysis of the factors set forth in Green Oil Co. v. Hornsby, 539 So.2d 218
(Ala. 1989). This issue also has merit, and provides an alternative ground for upholding the verdicts. This Court has held that the factors set forth in Green Oil are not "factors to be considered when determining whether a jury verdict solely forcompensatory damages is excessive." Pitt, 631 So.2d at 238 (emphasis original). The factors set forth in Green Oil are factors to be considered "in determining whether a jury award ofpunitive damages is excessive or inadequate." Id. (emphasis original). As previously noted, a review of a jury's award of compensatory damages on the ground of excessiveness focuses on the plaintiff. "In contrast, a review of a jury verdict for punitive
damages on grounds of excessiveness must focus on the defendant."Id. at 239 (emphasis original).
The damages awarded to the Danielses, excluding the wrongful-death award, were solely compensatory. After analyzing the following portions of the trial court's order, we think it clear that the trial court failed to confine its application of the Green Oil factors to the wrongful-death award:
 "This leaves the matter of remittitur. The Court will consider it as to each individual plaintiff.
 "Before addressing the Court's determination as to each individual plaintiff, the Court finds certain caveats applicable to most or all, and addresses them collectively and/or individually so that they may not be unnecessarily repeated. They are as follows:
 "1. The result of the awards, even when reduced, certainly remove[s] defendant's profit from this particular job, and probably results in a loss. Considering insurance, there is no evidence that this has a devastating effect on the defendant's financial position. Some verdicts are `windfalls,' and are not justified. As reduced, they are not.
". . . .
 "6. This Court has reviewed and considered the relationship to harm, reprehensibility, awareness, profit and loss, deterrents, stinging, fair punishment and a comparative analysis of other cases."
(Emphasis added.)
After analyzing the trial court's brief synopsis of the Danielses' injuries, etc., we find it clear that the trial court gave insufficient deference to the testimony regarding their pain, suffering, and grief. It is, therefore, logical to conclude that the trial court, in reviewing the individual compensatory-damages verdicts for excessiveness, focused on EAPI and on EAPI's conduct, rather than on the plight of the Danielses, as victims. As noted in Pitt, "[t]hese considerations have no place in a review of a purely compensatory jury award, where a reviewing court should view the award from the standpoint of the victim." Id. at 239. Accordingly, we must reverse the trial court's order and direct the trial court to enter a judgment based on the jury's personal-injury awards. Id. *Page 1052 
 Conclusion
We affirm the JML in favor of EAPI on the wantonness count; we find no reason to set aside the verdicts on the personal-injury claims; we reverse the order requiring remittiturs; and we remand the cause with directions to the trial court to enter a judgment based on the original jury awards.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH DIRECTIONS.
Hooper, C.J., and Cook, J., concur.
Maddox and See, JJ., concur specially.
Kennedy, J., concurs in the holdings.
Johnstone, J., concurs in part and dissents in part.
[1] Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986);Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala. 1989).
[2] BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996).