MOORE, Judge.
 

 Kevin Lee Galloway appeals from summary judgments entered by the Calhoun Circuit Court (“the trial court”) in favor of Ozark Striping, Inc. (“OSI”), and Alabama Barricade, Inc. (“ABI”), in a personal-injury action. We affirm in part, reverse in part, and remand.
 

 Procedural H.isto'ry
 

 On September 8, 2006, Galloway filed a complaint against Reginald Wayne Jairrels II, O.K., Inc., OSI, ABI, and various fictitiously named parties, seeking compensatory and punitive damages for personal injuries he allegedly received on September 10, 2004, when an automobile driven by Jairrels struck him while he was placing a traffic cone on U.S. Highway 78 during the course of his employment with McCartney Construction. Galloway alleged that Jairrels had negligently and/or wantonly operated his motor vehicle thereby causing injury to Galloway. Galloway also alleged that O.K., Inc., OSI, and ABI had negligently and/or wantonly failed to provide Galloway with a safe workplace by failing to control traffic flow sufficiently to prevent the accident. All the defendants
 
 *416
 
 filed answers denying liability and asserting various affirmative defenses. The trial court dismissed the complaint against O.K., Inc., on June 29, 2007. After Galloway reached a pro tanto settlement with Jairrels, the trial court also dismissed the complaint against Jairrels on October 8, 2008.
 

 OSI filed a motion for a summary judgment on March 7, 2007. ABI filed a motion for a summary judgment on July 11, 2008. Galloway filed his response to the motions on July 22, 2008. In that response, Galloway specifically abandoned his wantonness claim. After conducting a hearing on the motions, the trial court granted the motions in two separate detailed judgments entered on September 8, 2008. Galloway timely filed his notice of appeal to the Supreme Court of Alabama on October 14, 2008; pursuant to Ala.Code 1975, § 12-2-7, that court transferred the appeal to this court on November 7, 2008.
 

 Issues
 

 On appeal, Galloway argues that the trial court erred in entering the summary judgments on his negligence claim. Galloway contends that he proved that both OSI and ABI owed him a duty of care and that a genuine issue of material fact exists as to whether they breached their duty and proximately caused his injuries.
 

 Standard of Review
 

 In
 
 Sizemore v. Owner-Operator Independent Drivers Ass’n,
 
 671 So.2d 674, 675 (Ala.Civ.App.1995), this court stated:
 

 “The law regarding summary judgment is well established. A motion for summary judgment tests the sufficiency of the evidence. Such a motion is to be granted when the trial court determines that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Rule 56, [Ala.] R. Civ. P. The moving party bears the burden of negating the existence of a genuine issue of material fact.
 
 Melton v. Perry County Board of Education,
 
 562 So.2d 1341 (Ala.Civ.App.1990). Furthermore, when a motion for summary judgment is made and supported as provided in Rule 56, the nonmovant may not rest upon mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. Rule 56(e), [Ala.] R. Civ. P. Proof by substantial evidence is required. Ala. Code 1975, § 12-21-12;
 
 Bass v. South-Trust Bank of Baldwin County,
 
 538 So.2d 794 (Ala.1989). The reviewing appellate court must apply the same standard utilized by the trial court when reviewing a summary judgment.
 
 Melton, supra.
 
 Additionally, the entire record is reviewed in a light most favorable to the nonmovant.
 
 Mann v. City of Tallassee,
 
 510 So.2d 222 (Ala.1987).”
 

 Facts
 

 In reviewing a summary judgment, this court is limited to a consideration of only the evidence submitted to the trial court when it ruled on the motion for a summary judgment.
 
 Bean v. State Farm Fire & Cas. Co.,
 
 591 So.2d 17, 20 (Ala.1991). In the present case, that evidence consisted of the materials attached to or filed in support of OSI’s and ABI’s motions and Galloway’s response thereto. That evidence tended to show the following. In 2004, the Alabama Department of Transportation (“ALDOT”) decided to repave approximately nine miles of a two-lane portion of Highway 78 that runs through Calhoun County (“the project”). ALDOT developed a construction plan for the project that was prepared by its engineers. That plan included, among other things, provisions regulating the control of traffic during the repaving project. The plan specified that the speed limit on the project
 
 *417
 
 would be 55 miles per hour, even though at times one of the lanes of travel would be closed. The plan also called for the use of flag men and pilot vehicles to guide motorists through the construction when a lane was closed. In addition, the plan required the placement of approximately 90 signs in and around the work site, stating things such as “Road Work Ahead,” “End Road Work,” “Speeding Fines Doubled,” “Uneven Lanes,” “Bump,” “One Lane Road Ahead,” and “Workers Present.” For the purposes of this appeal, we refer to those signs as “the construction signs.” Paul Kenneth Naugher, the ALDOT project engineer, testified that the traffic-control plan for the project set out the “bare minimum” amount of traffic control required for that type of project.
 

 On July 2, 2004, ALDOT awarded the repaving contract to McCartney Construction (“McCartney”), Galloway’s employer. McCartney subsequently entered into subcontracts with OSI and ABI. Pursuant to its subcontract, ABI agreed to supply, install, and maintain all the construction signs specified by the construction plan, including two signs designating the speed limit as 55 miles per hour. Pursuant to its subcontract, OSI agreed to stripe the solid and broken white and yellow lines on the highway once paving and resurfacing was completed.
 

 Neither ABI employees nor OSI employees were involved in the planning process for the project. ABI and OSI had no authority regarding the establishment of the speed limit, which was the responsibility of ALDOT.
 
 [1]
 
 Neither ABI nor OSI designed the traffic-control plan for the project. ABI did not determine the construction signs to be used or where those signs would be located. ABI simply supplied the construction signs ALDOT specified in the construction plan and placed those signs where ALDOT employees instructed. ABI did not have the authority to change the construction signs that were specified or to alter their locations without ALDOT’s approval. ABI employees spent several days on the site erecting the construction signs. ALDOT inspected the site daily to ensure that the construction signs were placed in accordance with the construction plan. Thereafter, when notified of a problem with a construction sign, ABI employees would travel to the site and repair the construction sign.
 

 The subcontracts of ABI and OSI contained the following provisions:
 

 “1.1 The Subcontractor hereby agrees to furnish all labor, shop and erection drawings, samples, supervision, services, materials, equipment, tools, scaffolds, transportation, storage and all other things necessary to perform the work described in Rider A attached hereto (hereinafter called the Work’ the terms of which are incorporated by reference), being a portion of the work required of Contractor under the Prime Contract between Owner and Contractor, and all work incidental thereto.... The Work shall be performed by Subcontractor strictly in accordance with the Contract Documents, which consists of the Prime Contract between Contractor and Owner, and the plans, drawings, conditions, specifications, addenda attached and/or incorporated into the contract between Contractor and Owner which are incorporated by reference into this Subcontract; this Subcontract; general conditions, drawings and specifications prepared by the Alabama Department of Transportation; other documents identified in Rider B attached
 
 *418
 
 hereto (the terms of which are incorporated by reference) and all modifications issued hereinafter thereto (hereinafter call [sic] the ‘Contract’ or ‘Contract Documents’).
 

 “1.2 ... Subcontractor represents and agrees that it has had access to all Contract Documents and has carefully examined and understands the Contract Documents that Subcontractor deems relevant to the Work; has previously notified Contractor in writing of all ambiguities, inconsistencies and omissions, if any, in the Contract Documents that relate to the Work; has adequately investigated the nature and conditions of the Project Site and locality; has familiarized itself with conditions affecting the difficulty of the Work; and has entered into the Subcontract based on its own examination, investigation and evaluation and not in reliance upon any opinions or representations of Contractor.
 

 “1.3 In the performance of the Work, Subcontractor agrees that, except as expressly otherwise stated in this Subcontract, it is bound to Contractor by the terms and conditions of the Contract Documents and that Subcontractor is obligated and liable to Contractor to the same extent Contract is obligated and liable to Owner. Subcontractor hereby assumes toward Contractor all of the duties, obligations and responsibilities that Contractor has by the Prime Contract and Contract Documents assumed toward the Owner....
 

 [[Image here]]
 

 “2.3 On portions of the contract being performed by Subcontractor, Subcontractor shall erect suitable guardrails, appropriate warning signs, lights, or other traffic control devices as required by the Contract Documents referred to herein, along with plans and specifications, the current Alabama Department of Transportation Standard Specifications Supplemental Specifications and Special Provisions as evidenced by the Special Provisions sheet of said contract, a copy of which is attached hereto as Rider B (the terms of which are incorporated by reference). This provision shall apply regardless of whether guardrails, signs, lights, or other traffic control devices are furnished by Contractor or Subcontractor; and if they are being furnished by Contractor, Subcontractor shall be responsible to ensure that same are obtained and utilized and maintained in accordance with plans and specifications, the current Alabama Department of Transportation Standard Specifications, Supplemental Specifications and Special Provisions as evidenced by the Special Provisions sheet of said contract, attached hereto as Rider B.
 

 [[Image here]]
 

 “12.1. Subcontractor accepts complete responsibility for the health and safety of its employees and its subcontractors’ employees, the safe performance of the Work and compliance with all applicable state and federal health and safety laws, including, but not limited to the regulations and standards of the Occupational Safety & Health Act of 1970 (‘OSHA’), as amended.
 

 “12.2 Contractor shall have no duty to monitor Subcontractor’s practices or performance of the Work for safety and shall have no duty to stop Subcontractor’s unsafe practices or to insure that Subcontractor’s practices and methods of performing the work are safe.”
 

 Because federal aid funded a portion of the project, additional provisions were placed in ABI’s and OSI’s subcontracts, including the following:
 

 “VIII. SAFETY: ACCIDENT PREVENTION
 

 
 *419
 
 “1. In the performance of this contract the contractor shall comply with all applicable Federal, State, and local laws governing safety, health, and sanitation (23 CFR 635). The contractor shall provide all safeguards, safety devices and protective equipment and take any other needed actions as it determines, or as the [State highway agency] contracting officer may determine, to be reasonably necessary to protect the life and health of employees on the job and the safety of the public and to protect property in connection with the performance of the work covered by the contract.
 

 “2. It is a condition of this contract, and shall be made a condition of each subcontract, which the contractor enters into pursuant to this contract, that the contractor and any subcontractor shall not permit any employee, in performance of the contract, to work in surroundings or under conditions which are unsanitary, hazardous or dangerous to his/her health or safety, as determined under construction safety and health standards (29 CFR 1926) promulgated by the Secretary of Labor, in accordance with Section 107 of the Contract Work Hours and Safety Standards Act (40 U.S.C. 333).”
 

 On September 10, 2004, sometime between 7:00 a.m. and 8:00 a.m., Galloway was working for McCartney as a flag man on the project. While preparing to close one of the two lanes in preparation for paving, Galloway was standing in the eastbound lane of Highway 78 placing a traffic cone. At that time, Galloway was struck by an automobile traveling east that was operated by Jairrels. Jairrels testified by deposition that, for several months, he had observed that Highway 78 was under construction in the area where the accident occurred. He also testified that, previously, when one lane had been closed, a flag man would hold up signs directing motorists to “slow” or “stop” (hereinafter referred to as “warning signs”) and that the traffic would alternate traversing the open lane. He also testified that he had previously observed the use of a pilot car to guide traffic through the open lane. Jair-rels testified that, on the day of the accident, he had not seen any warning signs or a pilot car and that he had not seen Galloway before his vehicle struck Galloway. The only sign Jairrels recalled seeing on the day of the accident was a speed-limit sign indicating that the speed limit was 55 miles per hour. Jairrels testified that, had he been traveling less than 55 miles per hour or had he been escorted by a pilot car, he could have avoided the accident. Jairrels further testified that he would have slowed and used reasonable precautions to avoid Galloway had he been warned of Galloway’s presence.
 

 When closing a lane for paving, McCartney employees implemented traffic-control procedures to guide traffic. Those procedures included placing portable warning signs that indicated the presence of workers and using flag men and a pilot truck. ABI and OSI were not involved with traffic control for closing a lane in order to perform paving operations. McCartney, not ABI, provided the portable warning signs.
 

 According to ALDOT’s reports from the date of the accident, all the construction signs specified in ABI’s subcontract were in place. Only one ABI employee worked at the site on the day of the accident, but the record contains no evidence indicating whether that employee was present at the time of the accident. Naugher testified that ABI’s duties that day only consisted of covering two “bump” signs and correcting a leaning speed-limit sign that had been facing westbound traffic. None of those signs were closer than two miles
 
 *420
 
 from the accident site. OSI had begun striping work on September 2, 2004, but OSI did not have any employees on the project site at the time of the accident because OSI did not commence its striping work until the late afternoon or early evening when paving was complete for the day.
 

 Naugher testified that, if ALDOT’s traffic-control plans are not correctly implemented, then accidents involving drivers traveling through a project site and persons working on the project are more likely to occur. James Deatherage, Ph.D., a civil-engineering expert retained by Galloway, opined that the speed limit on the construction site was too high for the project conditions. Deatherage stated in an affidavit that ABI and OSI should have appreciated the danger of such a high speed limit and, pursuant to their contractual duties, should have taken all reasonable steps to have ALDOT lower the speed limit to 25 miles per hour. Deatherage faulted ABI and OSI for not recognizing the hazards created by such a high speed limit and for not taking those actions necessary to have the speed limit reduced. Deatherage also opined that ABI and OSI had breached the standard of care by failing to maintain the required construction signs that were mandated by ALDOT’s traffic-control plan if, in fact, those construction signs were not in place. Death-erage further opined that “there exists a reasonable debate about whether [OSI] was, in fact, responsible for traffic control at all times relevant to [the accident]” and that, if OSI was in fact in control, then OSI had breached the standard of care by failing to ensure that a pilot vehicle was present and being used in accordance with ALDOT’s traffic-control plan. Deatherage stated that, if ABI and OSI had fulfilled their duties, the accident probably would not have occurred.
 

 Merrill Whittington, ABI’s corporate representative, testified by deposition that, in the past, he had requested changes to road-construction plans that posed a hazard to the motoring public and ABI employees but that he had never asked to change a speed limit because “that’s not my call.” Whittington testified that he had reviewed the construction plan for the project, including the 55-mile-per-hour speed limit, but that he had not objected to it. Leon Gross III, president of OSI, testified by deposition that, in the past, he had pointed out errors in striping plans that needed correction and that he would not “put anything down” that would endanger motorists or his employees. Gross stated that he had never been on a construction site where he thought the posted speed limit was too high. Gross testified that he had not worked on the site at issue and that he had not known of the 55-mile-per-hour speed limit until he was deposed. Gross testified that, due to his unfamiliarity with the site, he did not have an opinion as to whether the posted speed limit was too high. However, Gross earlier testified that he had considered all road-construction work to be unsafe because of motorists’ traveling through the working area.
 

 Analysis
 

 Galloway first maintains that ABI and OSI owed him a duty to take all reasonable steps to lower the construction-zone speed limit from 55 miles per hour to 25 miles per hour. Section 82-5A-176.1, Ala.Code 1975, imposes on ALDOT the duty to establish speed limits in rural and urban construction zones along state and interstate highways.
 
 [2]
 
 Presumably, our
 
 *421
 
 legislature recognized that ALDOT employs professionals sufficiently familiar with .the criteria for establishing and implementing construction-zone speed limits because § 32-5A-176.1 does not set out in any detail how ALDOT is to determine the appropriate speed limit and does not authorize ALDOT to delegate its authority for setting speed limits to another entity. Nevertheless, Galloway argues that ABI and OSI had a duty to prevail upon AL-DOT to lower the speed limit in this case under
 
 Aldridge v. Valley Steel Construction, Inc.,
 
 603 So.2d 981, 984 (Ala.1992), and the terms of the subcontracts.
 

 In
 
 Aldridge, supra,
 
 the supreme court held that “an independent contractor is not free to comply with obviously defective plans and specifications that the contractor should know may create unreasonably dangerous conditions.” 603 So.2d at 984. Galloway points out that, in the subcontracts, both ABI and OSI agreed that they had reviewed the construction plan establishing the speed limit. Deatherage testified that the 55-mile-per-hour speed limit was obviously too high. The principal officers for both companies testified that, in the past, they had objected to hazardous construction plans. Hence, Galloway maintains that, under the rule of
 
 Aldridge,
 
 ABI and OSI had a duty to recognize the obvious defect in the construction plan and to take reasonable steps to have ALDOT remedy the defect.
 

 In
 
 Aldridge,
 
 an independent contractor installed a pump motor in precise compliance with specifications provided by the owner of a plant. The electrical-control panel for the pump exploded, allegedly due to infiltration by fluids, and injured a plant worker. That worker presented expert testimony indicating that the contractor should not have followed the installation plans provided by the plant owner because the contractor should have known that they violated an applicable safety code. 603 So.2d at 982-84. The supreme court stated:
 

 “The law in Alabama concerning liability of contractors following acceptance of their work by the owner was set out in
 
 McFadden v. Ten-T Corp.,
 
 529 So.2d 192, 200 (Ala.1988) (quoting from
 
 Hunt v. Blasius,
 
 74 Ill.2d 203, 23 Ill.Dec. 574, 577, 384 N.E.2d 368, 371 (1978)):
 

 “1
 
 “An independent contractor owes no duty to third persons to judge the plans, specifications or instructions which he has merely contracted to follow. If the contractor carefully carries out the specifications provided him, he is justified in relying upon the adequacy of the specifications unless they are so obviously dangerous that no competent contractor would follow them.” ’
 

 “Pursuant to
 
 McFadden,
 
 this Court has adopted the view that an independent contractor is not free to comply with obviously defective plans and specifications that the contractor should know may create unreasonably dangerous conditions. Rather, a contractor is expected to act reasonably under the particular circumstances in order to avoid accidents. However, this Court has not had the opportunity to explore the contours of the liability of such a contractor who discovers, or should have discovered, an apparent defect in the plans and specifications, or the effect a subsequent change or modification would have on the contractor.”
 

 
 *422
 
 603 So.2d at 984. The supreme court held that summary judgment was not appropriate because questions of fact remained as to, among other things, whether the installation plans were defective and whether the independent contractor should have discovered the alleged defect. 603 So.2d at 984-85.
 

 Although the “contours” of the rule established in
 
 McFadden
 
 and
 
 Aldridge
 
 have yet to be fully delineated even now, it is apparent that the rule applies solely to contractors who construct, install, or modify a device that subsequently causes injury. In
 
 Aldridge,
 
 the contractor was hired to install the very pump that later exploded. In
 
 Hannah v. Gregg, Bland & Berry, Inc.,
 
 840 So.2d 839 (Ala.2002), the supreme court reversed a summary judgment for a contractor based on evidence indicating that the contractor had converted a belt-wrapper machine without adding a barrier guard that was required by applicable safety standards, which resulted in the death of a worker who got pinned in the machine. In
 
 Nicholson v. Alabama Trailer Co.,
 
 791 So.2d 926 (Ala.2000), the supreme court held that a trailer company that had designed a trailer to meet the specifications of a utility company was not entitled to summary judgment in a wrongful-death action because some evidence indicated that the trailer company should have known that the design was flawed because of the absence of stanchions and that that flaw could cause the trailer load to fall. In each of those cases, the contractor, as an expert in the building or installation of the injurious device, should have known of the obvious defect and was in the best position to remedy that defect.
 

 Unlike the contractors in
 
 Aldridge
 
 and its progeny, ABI and OSI are not charged with any specialized knowledge as to the method and manner for establishing speed limits in highway-construction zones. The record indicates that ALDOT did not request or rely on any input from either subcontractor but, instead, pursuant to its statutory duty, formulated the speed limit itself. We therefore decline to extend the
 
 Aldridge
 
 rule to the situation presented in the present case, and, accordingly, we hold that ABI and OSI did not have a duty to correct, or to request that ALDOT correct, the speed limit established by ALDOT.
 

 Galloway next argues that OSI, and to a lesser extent, ABI, had a duty to provide a pilot vehicle because it was foreseeable that Galloway would be injured without one.
 
 See Smitherman v. McCafferty,
 
 622 So.2d 322, 324 (Ala.1993) (recognizing foreseeability as a key factor in imposing legal duty). That argument has no merit. Although it may have been foreseeable to OSI and ABI that the absence of a pilot vehicle could cause Galloway injury, the law does not impose a duty based on foreseeability alone. Rather, in cases involving injuries on construction sites, the determination whether a subcontractor owes a duty to a general contractor’s employee depends on whether that subcontractor has control over the method and manner by which the work was to be performed.
 
 See Garner v. Hutcheson Constr. Co.,
 
 661 So.2d 221 (Ala.1995);
 
 Procter & Gamble Co. v. Staples,
 
 551 So.2d 949, 950 (Ala.1989) (construing Ala. Code 1975, § 25-1-1, as requiring “employers” to provide reasonably safe place to work to “employees” as those terms are defined therein). In this case, the record indicates that McCartney, not ABI or OSI, provided and controlled the pilot vehicles that were used during lane closings.
 

 Galloway nevertheless argues that the subcontracts required ABI and OSI to assure that the entire construction site was reasonably safe and that appropriate traffic-control devices, which would include pilot vehicles, were being used.
 
 See H.R.H.
 
 
 *423
 

 Metals, Inc. v. Miller ex rel. Miller,
 
 833 So.2d 18, 25 (Ala.2002) (holding that duty to provide reasonably safe place to work may be assumed in contract). We do not agree. Articles 1, 2, and 12 of the subcontracts all govern OSI’s and ABI’s obligations to provide for the safe performance of their portion of the contract, known as “the Work.” The subcontracts define the term “the Work” as “the work described in Rider A.” In relation to ABI, that rider refers exclusively to the provision of the construction signs, while OSI’s rider refers solely to its striping responsibilities. Nothing in Articles 1, 2, and 12 suggests that OSI and ABI agreed to investigate and monitor the conditions of the project for the purpose of protecting the safety of McCartney’s employees or for the purpose of assuming custody and control of the entire job site and the manner in which every activity on that site was performed. More specifically, neither OSI nor ABI agreed to control the work of McCartney’s employees or to assume any safety responsibilities over the repaving operations conducted by McCartney.
 

 By the terms of Article VIII, section 2, OSI and ABI
 

 “shall not permit any employee, in performance of the contract, to work in surroundings or under conditions which are unsanitary, hazardous or dangerous to his/her health or safety as determined under construction safety and health standards (29 CFR 1926) promulgated by the Secretary of Labor in accordance with Section 107 of the Contract Work Hours and Safety Standards Act (40 U.S.C. 333).”
 

 The term “employee” is defined in federal regulations to include every laborer on a worksite “regardless of the contractual relationship which may be alleged to exit between the laborer ... and the contractor or subcontractor who engaged him.” 29 C.F.R. § 1926.32(j). Galloway maintains that OSI and ABI assumed a duty to assure that Galloway, as an “employee” within the meaning of § 1926.32(j), was not working in conditions dangerous to his safety. However, the above-quoted clause defines that duty to extend only to conditions that are dangerous “as determined under construction safety and health standards (29 CFR 1926) promulgated by the Secretary of Labor in accordance with Section 107 of the Contract Work Hours and Safety Standards Act (40 U.S.C. 333).” Galloway has not cited to this court a single construction safety and health standard promulgated by the Secretary of Labor to support his contention that the duty assumed in Article VIII, section 2, included the responsibility to ensure the use of pilot vehicles. “It is neither the duty nor the function of an appellate court to perform a party’s legal research.”
 
 Sullivan v. Alfa Mut. Ins. Co.,
 
 656 So.2d 1233, 1234 (Ala.Civ.App.1995).
 

 Galloway last argues that ABI and OSI had a duty to assure that appropriate signs were in place to alert motorists to the presence of workers on the construction site. As to OSI, we disagree. Although Article 2.3 obligates OSI to “erect suitable guardrails, appropriate warning signs, lights, or other traffic control devices as required by the Contract Documents,” the article specifies that OSI must use such traffic-control devices only “[o]n portions of the contract being performed by Subcontractor.” Article 2.3 unambiguously requires OSI to use the traffic-control devices set out in the contract when performing striping work. When those devices are provided to OSI by McCartney, Article 2.3 further requires OSI to assure that the devices are “utilized and maintained in accordance with plans and specifications, the current Alabama Department of Transportation Standard
 
 *424
 
 Specifications Supplemental Specifications and Special Provisions .... ” However, that language does not in any manner impose upon OSI the duty to assure that McCartney used required warning signs when performing its paving operations. Galloway cannot rely on Article VIII, section 2, to create that duty because, as we mentioned above, Galloway has not cited any regulation requiring OSI to use warning signs for the protection of Galloway.
 
 See Sullivan, supra.
 

 For the same reasons, we reject Galloway’s argument that Article 2.3 or Article VIII, section 2, required ABI to erect and maintain warning signs when McCartney closed a lane for its paving operations. However, ABI did agree in its subcontract to provide, install, and maintain the construction signs set out in the construction plan. Those signs were intended to be placed permanently in and around the construction zone to alert motorists to, among other things, the presence of workers. It was foreseeable to ABI that, if it negligently performed or failed to perform its contractual duties, then Galloway, a worker on the roadway project, could be injured.
 
 See Nelson by and through Sanders v. Meadows,
 
 684 So.2d 145 (Ala.Civ.App.1996) (holding that duty of reasonable care to third parties may arise from contractual obligation when injury to third party resulting from negligent failure to perform contractual duty is foreseeable). The question, therefore, is whether Galloway presented substantial evidence indicating that ABI breached that duty.
 
 See Brown v. Whitaker Contracting Corp.,
 
 681 So.2d 226 (Ala.Civ.App.1996), overruled on other grounds,
 
 Schneider Nat’l Carriers, Inc. v. Tinney,
 
 776 So.2d 758, 756 (Ala.2000) (recognizing that evidence of breach of duty to place appropriate warning signs in roadway-construction zone can preclude summary judgment).
 

 ABI contends that the
 
 evidence is
 
 not in dispute on this point. ALDOT records indicate that, on the date of the accident, all the construction signs required by the construction plan were “in place throughout job.” Galloway maintains, on the other hand, that he presented substantial evidence indicating that the ALDOT reports are not reliable. Indeed, Naugher testified that he did not sign the traffic-control-device log for the day of the accident and that the absence of his signature meant that he could not rely on the log to accurately reflect the condition on the date of the accident, i.e., whether the construction signs were, in fact, in place. Moreover, Jairrels testified as follows:
 

 “Q: Were you able to see road signs?
 

 “[JAIRRELS]: Yes.
 

 “Q: Were you able to see — were the weather conditions such that any street lights were on, that you recall?
 

 “A: There weren’t any traffic signs but, no, there weren’t any street lights on.
 

 “Q: Okay. That you recall?
 

 “A: Yeah.
 

 [[Image here]]
 

 “Q: Did you see — do you recall seeing any traffic signs whatsoever?
 

 “A: No.
 

 [[Image here]]
 

 “Q: Okay. And did you ever see any signs on this road that said ‘Construction in progress,’ or, Workers Present’?
 

 “A: Are you talking about at the time of the — the day of the accident?
 

 “Q: Yes, sir, and any other time. Let’s take the day of the accident first.
 

 “A: The day of the accident, no.
 

 [[Image here]]
 

 
 *425
 
 “Q: Okay. And do you recall seeing a sign on the day that Mr. Galloway was there?
 

 “A: No.”
 
 [3]
 

 Jairrels testified that the only sign he recalled seeing on the date of the accident was a speed-limit sign. That testimony is substantial evidence creating a genuine issue of material fact as to whether ABI breached its duty to erect and maintain the construction signs.
 
 See Daniels v. East Alabama Paving, Inc.,
 
 740 So.2d 1033 (Ala.1999) (affirming judgment in part based on evidence indicating that highway-construction company did not place appropriate warning signs to alert motorists to pavement drop-off).
 

 The record likewise contains substantial evidence indicating that ABI’s failure to erect and maintain the construction signs, if that failure in fact occurred, proximately caused the accident.
 
 See Sanders,
 
 684 So.2d at 150 (discussing proximate cause as element of negligence action). “[I]n Alabama ... a negligent act or omission is the proximate cause of an injury if the injury is ‘a natural and probable consequence of the negligent act or omission which an ordinarily prudent person ought reasonably to foresee would result in injury.’ ”
 
 Id.
 
 (quoting
 
 Vines v. Plantation Motor Lodge,
 
 336 So.2d 1338, 1339 (Ala.1976)). Proximate causation is ordinarily a question for the jury.
 
 Id.
 

 Naugher testified that, absent full compliance with the traffic-control plan, the likelihood of an accident involving a motorist and a worker increases. Jairrels testified that, if he had been alerted earlier to the presence of workers at the site, he would have taken precautions to avoid the accident. Deatherage opined in his affidavit that, had ABI complied with its duty to maintain the construction signs, the accident probably would not have occurred.
 

 In response, ABI argues that Jairrels testified that he would have been more observant only if he had seen warning signs placed immediately before the accident scene. ABI maintains that McCartney, not ABI, would have been responsible for placing portable warning signs immediately before the site of the accident when closing a lane for paving operations. We have closely reviewed the portions of Jair-rels’s testimony upon which ABI relies. Jairrels did not testify as ABI maintains. Jairrels simply stated that, if he had seen signs alerting him to the fact that workers were present at the construction site, he would have slowed down and taken precautions to avoid those workers. He did not indicate that only warning signs placed immediately before the accident scene would have been effective. Jairrels referred precisely to the type of signs ABI was hired to install.
 

 ABI further contends that Jairrels already knew about the construction zone, having seen it for months before the accident, and that fog or the sun may have obscured Jairrels’s vision. Those contentions tend to indicate that the absence of the construction signs may not have been the proximate cause of the accident, but they do not conclusively decide that issue in light of the substantial evidence to the contrary. We therefore hold that a genuine issue of material fact exists as to the proximate cause of the accident.
 

 
 *426
 
 To summarize, we conclude that Galloway has not presented substantial evidence indicating that OSI owed him a duty to lower the speed limit, or to request that ALDOT lower the speed limit, in the construction zone or to assure the use of traffic-control devices. We, therefore, affirm the summary judgment entered in favor of OSI. Although we conclude that ABI also owed no duty to Galloway to lower the speed limit, or to request that ALDOT lower the speed limit, we do conclude that ABI owed Galloway a duty to perform its contractual obligation to erect and maintain the construction signs set out in the construction plan in a reasonable manner. We further conclude that genuine issues of material fact exist as to whether ABI breached that duty and whether the breach of that duty proximately caused the accident. We, therefore, reverse the summary judgment entered in favor of ABI, and we remand the case for further proceedings consistent with this opinion.
 

 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
 

 THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ., concur.
 

 [1]
 

 . Naugher testified that, other than ALDOT, no entity could change a speed limit other than the Alabama Department of Public Safety-
 

 [2]
 

 . Alabama Code 1975, § 32-5A-176.1, provides, in pertinent part:
 

 "(a) The State Department of Transportation may set the speed limits in urban and
 
 *421
 
 rural construction zones along state and interstate highways and the county commission of a county may set the speed limits in urban and rural construction zones along county roads or highways."
 

 [3]
 

 . In its judgment granting ABI’s summary-judgment motion, the trial court stated, in part:
 

 "[Galloway] cannot rely on the testimony of Jairrels, who stated merely that he did not see certain signs, when Jairrels also agreed that it was not his responsibility to determine whether the proper signs were in place, and that he would not dispute evidence from ALDOT as to whether all of the proper signs were up.”
 

 Based upon our review of the record, we find no testimony to that effect.