SELLERS, Justice.
*509 Eduard David Evans Kennedy sued Tomlin Construction, LLC, and its employee, Stuart McQuaid Campbell, Jr., seeking damages for personal injuries Kennedy suffered when the Plymouth Grand Voyager passenger van he was driving collided with a 2007 Caterpillar motor grader belonging to Tomlin Construction and being operated by Campbell; the accident occurred in a construction zone. The jury returned a verdict in favor of Kennedy, awarding him compensatory damages in the amount of $3,000,000. Campbell and Tomlin Construction filed a postjudgment motion for a judgment as a matter of law ("JML"), a new trial, or a remittitur of damages; the trial court denied that motion. Campbell and Tomlin Construction appeal. We affirm.
I. Facts and Procedural History
On September 1, 2009, the Alabama Department of Transportation ("ALDOT") contracted with Tomlin Construction, a road-construction and excavation company, for work on a "0.945 mile bridge replacement and approaches" on U.S. Highway 43 in Greene County. Pursuant to the terms of the contract, ALDOT prepared the project specifications, including the traffic-control plans, and had supervisors on site to ensure compliance with those specifications and plans.
On June 17, 2010, at approximately 2:30 p.m., Kennedy, accompanied by four passengers, was traveling in his van on Highway 43 in the northbound lane[1] where, in connection with the above-described construction project, Campbell was operating a Caterpillar motor grader in the same lane of travel. As Kennedy's van attempted to proceed around the motor grader by crossing the double-yellow line into the southbound lane, the motor grader undertook a lefthand turn, causing the front left wheel housing and steer axle (hereinafter "the front axle") of the motor grader and the van to collide. Immediately following the accident, Kennedy was transported to Druid City Hospital in Tuscaloosa where he was treated for fractures to both sides of his jaw, a broken femur, and a pulmonary contusion.
In August 2010, Kennedy sued Campbell and Tomlin Construction, alleging that Campbell, while working in the line and scope of his employment with Tomlin Construction, had been negligent in operating the motor grader and that Campbell's negligence was the proximate cause of the accident.[2] Campbell and Tomlin Construction moved for a summary judgment, asserting, among other things, that Kennedy had been contributorily negligent as a matter of law in causing the accident. In opposition, Kennedy moved for a summary judgment or, alternatively, for sanctions, arguing that Larry Tomlin, the owner of Tomlin Construction, had engaged in spoliation *510 of evidence. Specifically, Kennedy asserted that, one week after the accident, counsel for Kennedy sent Tomlin a letter indicating that the motor grader was vital to their investigation of the accident, that they expected to be able to inspect the motor grader, and that they were requesting that the motor grader be retained in its immediate post-accident state until they could perform their inspection. Tomlin sent Kennedy's counsel a reply letter informing counsel that the motor grader remained at Tomlin Construction's worksite but was scheduled for repairs beginning July 15, 2010. Tomlin and his insurance carrier agreed to halt all repairs to the motor grader until Kennedy's counsel could inspect the motor grader on July 19, 2010. However, when Kennedy's counsel arrived at the worksite for the inspection, the motor grader was present, but the front axle had already been removed. The trial court denied Kennedy's motion for sanctions and/or a summary judgment based on the alleged spoliation of evidence; the trial court ruled, however, that Kennedy could present his spoliation-of-evidence claim to the jury. The case proceeded to trial. At the close of Kennedy's evidence and at the close of all the evidence, Campbell and Tomlin Construction moved for a JML, arguing that there was no evidence indicating that they had breached any duty of care owed Kennedy based on Tomlin Construction's compliance with all ALDOT specifications with regard to the construction project. They also argued that Kennedy had been contributorily negligent as a matter of law in causing the accident.
As indicated, the jury returned a verdict in favor of Kennedy in the amount of $3,000,000; the trial court entered a judgment on the verdict. Following the denial of their postjudgment motion, Campbell and Tomlin Construction appealed.
II. Discussion
A. JML--Negligence
Campbell and Tomlin Construction contend that the trial court erred in denying their motion for a JML because, they argue, Kennedy's alleged violation of Alabama's Rules of the Road constituted negligence per se and, thus, Kennedy was contributorily negligent as a matter of law. It is well settled that,
"[w]hen reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in granting or denying a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala. 1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented substantial evidence to allow the factual issue to be submitted to the jury for resolution. Carter v. Henderson, 598 So.2d 1350 (Ala. 1992). See, also, § 12-21-12, Ala. Code 1975, and West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). A motion for JML 'is properly denied where there exists any conflict in the evidence for consideration by the jury.' Cloverleaf Plaza, Inc. v. Cooper & Co., 565 So.2d 1147, 1149 (Ala. 1990). In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences from that evidence as the jury would have been free to draw."
Daniels v. East Alabama Paving, Inc., 740 So.2d 1033, 1037 (Ala. 1999).
In Norfolk Southern Ry. v. Johnson, 75 So.3d 624, 639 (Ala. 2011), this Court stated, concerning contributory negligence:
" 'Contributory negligence is an affirmative and complete defense to a claim based on negligence. In order to establish contributory negligence, the *511 defendant bears the burden of proving that the plaintiff 1) had knowledge of the dangerous condition; 2) had an appreciation of the danger under the surrounding circumstances; and 3) failed to exercise reasonable care, by placing himself in the way of danger.'
" Ridgeway v. CSX Transp., Inc., 723 So.2d 600, 606 (Ala. 1998). The issue of contributory negligence is generally one for a jury to resolve. Id. See also Savage Indus., Inc. v. Duke, 598 So.2d 856, 859 (Ala. 1992) ('The issue of contributory negligence cannot be determined as a matter of law where different inferences and conclusions may reasonably be drawn from the evidence.')."
Campbell and Tomlin Construction specifically argue that Kennedy, in crossing the double-yellow line in an attempt to pass the motor grader, violated § 32-5A-86, Ala. Code 1975, which provides, in pertinent part:
"(b) Where signs or markings are in place to define a no-passing zone ... no driver shall at any time drive on the left side of the roadway within such no-passing zone or on the left side of any pavement striping designed to mark such no-passing zone throughout its length.
"(c) This section does not apply under the conditions described in Section 32-5A-80(a)(2), nor to the driver of a vehicle turning left into or from an alley, private road, or driveway."
(Emphasis added.) Section 32-5A-80(a)(2), Ala. Code 1975, provides that "a vehicle shall be driven upon the right half of the roadway," except
"[w]hen an obstruction exists making it necessary to drive to the left of the center of the highway; provided, any person doing so shall yield the right-of-way to all vehicles traveling in the proper direction upon the unobstructed portion of the highway within such distance as to constitute an immediate hazard."
(Emphasis added.) Campbell and Tomlin Construction also contend that Kennedy violated § 32-5A-116, Ala. Code 1975, by failing to yield the right-of-way to the motor grader, which, they say, was actually engaged in highway construction at the time of the accident. Section 32-5A-116 provides:
"(a) The driver of a vehicle shall yield the right-of-way to any authorized vehicle or pedestrian actually engaged in work upon a highway within any highway construction or maintenance area indicated by official traffic-control devices.
"(b) The driver of a vehicle shall yield the right-of-way to any authorized vehicle obviously and actually engaged in work upon a highway whenever such vehicle displays such flashing lights as may be required or permitted by law or by regulation of the department."
(Emphasis added.)
Kennedy, on the other hand, asserts that he was justified in crossing the double-yellow line to pass the motor grader because, he says, the motor grader was obstructing his lane of travel. Kennedy further asserts that, at the time of the accident, the motor grader was not actually engaged in work on the highway and that the motor grader did not display any brake lights, hazard lights, or turning signals to indicate that it was engaged in work. These issues, however, were disputed at trial. Specifically, Kennedy testified that, as he entered the construction zone, he did not notice any signs or construction barrels, but he did see construction equipment on the side of the highway, and that he decreased the speed of his van to around 35 miles per hour. Kennedy further indicated that the motor grader appeared to be parked in the right lane of travel *512 without displaying any lights or turn signals and that, as he approached the motor grader, he decreased the speed of his van to 25 miles per hour, verified that there was no oncoming traffic, crossed the double-yellow line into the left lane, and accelerated to pass the motor grader. Kennedy stated that, as he attempted to pass the motor grader, the motor grader made a sharp 90-degree turn and blocked the entire road. The four passengers riding in the van at the time of the accident also testified and corroborated Kennedy's claims; however, each noted that the motor grader was originally moving forward before it came to a complete stop in the right lane.
Campbell, on the other hand, testified that, before the accident, he placed the motor grader into "travel mode" to move it from the south end of the construction zone to the north end where he planned to exit the highway to the left in order to cut a detour ditch; that he activated all lights on the motor grader, including its headlights and flashers; and that, before exiting the highway, he engaged his left turn signal and checked his mirrors for traffic. Campbell denied stopping the motor grader on the highway at any time but noted that he had decreased the speed of the motor grader to an estimated 18 miles per hour before attempting to exit the highway by way of the left turn. Campbell further testified that he did not use flagmen while driving the motor grader from the south end of the construction zone to the north end because, he said, it was approximately a one-mile journey and traffic was not being stopped in either direction. The evidence was undisputed that, when construction equipment shuts down a lane of travel, flagmen are generally required to control traffic flow. Campbell finally testified that, as he attempted to make a left turn to exit the highway, he saw a "flash," but by the time he realized that it was a vehicle, the vehicle had already struck the motor grader. Campbell claimed that the impact of the van pushed the 25-ton motor grader sideways causing a skid mark on the highway that, he says, he pointed out to Trooper Cleophus Robinson, Jr., who investigated the accident and completed the accident report. And, although Campbell never saw Kennedy's van before the impact, he was adamant that the van was traveling in excess of 60 miles per hour when it collided with the motor grader.
Kerry Rogers, another Tomlin Construction employee, testified that he witnessed the accident from inside his vehicle, which was parked at the worksite. Rogers testified that, at the time Kennedy attempted to pass the motor grader, Kennedy's van was traveling approximately 65 miles per hour. Rogers claimed that he was not listed as an eyewitness on the accident report because he was never asked and he was preoccupied with helping the injured passengers in the van.
Trooper Robinson, who investigated the accident, testified that he did not identify any eyewitness in his accident report and that he did not speak with any of the passengers of the van at the scene because they had been transported to the hospital before he arrived. Trooper Robinson's investigation of the scene confirmed that Kennedy's van was attempting to pass the motor grader using the southbound left lane while traveling northbound. He noted that, at the time of impact, the motor grader's front left tire was close to the shoulder of the road on the southbound side and the motor grader had cleared the northbound lane leaving no obstruction in that lane. Trooper Robinson testified that he did not find any skid marks at the scene of the accident and that he did not remember Campbell pointing out any skid marks. Trooper Robinson stated that he could not estimate or calculate the speed of either *513 vehicle; however, he noted that Campbell estimated the motor grader's speed as 15 miles per hour. Trooper Robinson stated that, although he did talk to Kennedy at the hospital, he did not recall Kennedy providing a precise speed for his van, but he did recall Kennedy saying that he had sped up to pass the motor grader.
Finally, Monica Weaver, the ALDOT employee who was the engineering assistant to the construction project, testified regarding the site conditions on the day of the accident. Weaver inspected the site both the morning of the accident and immediately after, and she indicated that the construction site was in compliance with ALDOT's specifications and requirements for signage and warnings. Weaver confirmed that the double-yellow line Kennedy crossed indicated a no-passing zone. She further testified that Kennedy's van appeared to hit the motor grader hard enough to "pull [the motor grader] around."
Clearly, there was an abundance of conflicting evidence before the jurors that would have allowed them to reach opposite conclusions as to whether Kennedy was justified in crossing the double-yellow line in an attempt to pass the motor grader; whether the motor grader was "actually engaged in work upon [the] highway," § 32-5A-116(b) ; and whether the motor grader was displaying any lights, flashing or otherwise, at the time of the accident. Accordingly, the actions of the trial court in denying Campbell and Tomlin Construction's motion for a JML on the issue of contributory negligence and in submitting the issue to the jury was proper.
B. New Trial--Spoilation-of-Evidence Instruction
Campbell and Tomlin Construction contend that the trial court committed reversible error when, over their objection, it charged the jury on the doctrine of spoliation of evidence as an inference of guilt or negligence. They specifically contend that there was no evidence indicating that Tomlin intentionally tampered with or actively concealed the damaged front axle of the motor grader or that he should have either anticipated litigation or known that the front axle was essential to Kennedy's claims.
The law in Alabama is well settled that
" '[a] party is entitled to proper jury instructions regarding the issues presented, and an incorrect or misleading charge may be the basis for the granting of a new trial.' Nunn v. Whitworth, 545 So.2d 766, 767 (Ala. 1989). If an objection to a jury charge is properly preserved for review on appeal, this Court will 'look to the entirety of the trial court's charge to see if there was reversible error.' Nelms v. Allied Mills Co., 387 So.2d 152, 155 (Ala. 1980). Reversal is warranted only when the error is considered to be prejudicial. Underwriters Nat'l Assurance Co. v. Posey, 333 So.2d 815, 818 (Ala. 1976).
"The strength of the jury verdict is based upon the right to trial by jury, White v. Fridge, 461 So.2d 793 (Ala. 1984), and a jury verdict is presumed to be correct. Alpine Bay Resorts, Inc. v. Wyatt, 539 So.2d 160, 162 (Ala. 1988). This presumption is strengthened by the trial court's denial of a motion for a new trial."
King v. W.A. Brown & Sons, Inc., 585 So.2d 10, 12 (Ala. 1991).
In Wal-Mart Stores, Inc. v. Goodman, 789 So.2d 166, 176 (Ala. 2000), this Court stated the following concerning spoliation of evidence:
"Spoliation is an attempt by a party to suppress or destroy material evidence favorable to the party's adversary.
*514 May v. Moore, 424 So.2d 596, 603 (Ala. 1982). Proof of spoliation will support an inference of guilt or negligence. May, 424 So.2d at 603. One can prove spoliation by showing that a party purposefully or wrongfully destroyed a document that the party knew supported the interest of the party's opponent. Id."
On June 18, 2010, the day after the accident, Thompson Tractor Company, at Tomlin's request, removed the damaged front axle of the motor grader and transported it to its shop for repairs. On June 24, 2010, one week after the accident, counsel for Kennedy sent a letter to Tomlin stating:
"The purpose of this letter is to notify you that the vehicle/equipment in your possession is vital to our investigation of this matter. During the course of this investigation, we expect to be able to inspect and photograph the vehicle/equipment and its component parts. Therefore, we request that you retain and protect said vehicle/equipment in the condition it was in immediately following this accident and that you in no way alter, repair, modify destroy or dispose of it. We would not expect you, or anyone else on your behalf, to conduct any tests of a destructive nature, or that you allow any other person or entity to conduct such tests."
(Emphasis added.) On July 9, 2010, Tomlin sent a reply letter to Kennedy's counsel representing that the motor grader was scheduled for repairs beginning July 15, 2010, and that it could be inspected at Tomlin Construction's worksite before that date:
"Please be advised that the 2007 Cat Motor grader damaged in the above referenced accident is scheduled for repairs beginning Thursday, July 15, 2010. The motor grader is currently at the worksite on Highway 43 in Demopolis, Al. Should you require an inspection and or photos please arrange for these prior to the 15th of July."
(Emphasis added.)
The parties thereafter reached an agreement that no repairs would be made to the motor grader until Kennedy's counsel could inspect it on July 19, 2010. When Kennedy's counsel arrived at Tomlin Construction's worksite to inspect the motor grader, however, the motor grader was present but the damaged front axle had been removed. Tomlin claimed that the front axle was removed the day after the accident because the motor grader was needed to complete the construction project;[3] he denied that he knew there was a potential for litigation at that time; and he denied he had the front axle removed to impede Kennedy's counsel from inspecting it. Tomlin further claimed that he informed anyone who called after the accident about the motor grader that its damaged parts were located at Thompson Tractor Company's shop. Tomlin finally admitted to signing the July 9, 2010, reply letter informing Kennedy's counsel that the motor grader was scheduled for repairs on July 15, 2010; he indicated that that date, however, represented the date that the motor grader would have been put back together at the worksite.
Although Tomlin disputes that he was aware of either the threat of litigation or the alleged importance of the front axle, he was, in fact, informed of both those things in the preservation letter he received from Kennedy's counsel approximately one week after the accident. Upon receiving *515 the preservation letter, however, Tomlin made no effort to halt the scheduled repairs to the front axle. Rather, Tomlin offered an inspection date of July 19, 2010, knowing that the repairs would already have been completed at that time. It is also questionable whether, assuming Kennedy's counsel could have proceeded to Thompson Tractor Company's shop to inspect the front axle as Tomlin suggests, the front axle would have been retained in its immediate post-accident state or whether it would have been broken down for the determination of replacement parts and/or for repair. Based on the foregoing evidence, we conclude that a sufficient foundation existed for the jury charge on the doctrine of spoliation of evidence. Cf. Russell v. East Alabama Health Care Auth., 192 So.3d 1170, 1177 (Ala. Civ. App. 2015) (finding insufficient evidence of spoliation where defendant lacked knowledge that there was a threat of litigation when it recorded over video surveillance of the plaintiff's fall on its premises). More importantly, we further conclude that the jury instruction on the doctrine of spoliation had no prejudicial effect on the trial of this case because, as discussed in more detail below, nothing in the record suggests that the jury's verdict was aimed at punishing the defendants for the alleged spoliation rather than merely compensating Kennedy for his injuries.
C. Remittitur--Compensatory Damages
Campbell and Tomlin Construction finally argue that the jury verdict for $3,000,000 in compensatory damages is excessive and that the trial court erred in not ordering a remittitur. At trial, Kennedy, who was then 27 years old, testified to the injuries he sustained in the accident and his subsequent treatment, which included surgery requiring the installation of a rod to repair his broken femur and the insertion of screws to repair injuries to his pelvis. Following his release from the hospital, Kennedy remained on crutches; he was also required to adhere to an all-liquid diet for six weeks as a result of his fractured jaw. During that time, he lived with his mother, who took care of him. Kennedy testified that, at the time of the trial, he was able to walk without crutches; however, he stated that he continued to experience pain in his leg daily and is no longer able to engage in certain activities, such as playing basketball. Kennedy testified that, at the time of trial, he was employed at a Wendy's fast-food restaurant but was limited to working part-time because he was unable to stand for long periods. Deborah Kennedy, Kennedy's mother, testified concerning Kennedy's recovery following surgery, the pain he experienced during that time, and the pain and limitations he continued to experience relating to his leg injury.
Jamarreo Likes, the general manager of the Wendy's restaurant where Kennedy was employed, also testified concerning Kennedy's work limitations, which he attributed to Kennedy's leg injury. Likes testified that he was satisfied with Kennedy's performance at work; he noted, however, that, because of Kennedy's physical limitations, he had to place Kennedy at certain stations requiring less movement and had to allow Kennedy to take more breaks than other employees. Likes further noted that Kennedy could not be promoted to a better position at Wendy's, e.g., manager, because he was unable to work longer hours.
Kennedy also presented the video depositions of both physicians who had treated him for his injuries. The testimony of Stephen T. Ikard, M.D., the orthopaedic surgeon who repaired Kennedy's femur, established that Kennedy's right femur was "comminuted" or broken into several pieces, including one area that was actually *516 "shattered." Dr. Ikard described the surgical procedure he performed that included installing of an intramedullary rod down the center of the femur bone to both align it and stabilize it. Dr. Ikard additionally described Kennedy's post-surgery recovery and the initial problems Kennedy experienced with the union of the bone to the rod, which ultimately required a bone-growth stimulator. Dr. Ikard was not able to testify to Kennedy's full recovery because Kennedy did not keep his follow-up appointments.
James L. Link, D.D.S., an oral and maxillofacial surgeon, testified that Kennedy suffered fractures to both the right mandible and the left mandible; he described the breaks as "a painful condition" but indicated that, despite the fractures, Kennedy's jawbones remained in alignment and that, for a more conservative approach, he had recommended a six-week liquid diet rather than surgery. Dr. Link further testified that, at the conclusion of those six weeks, Kennedy's jaw fractures appeared to be healing adequately, leaving no lasting impairment. Following Dr. Link's testimony, Kennedy submitted a compilation of medical bills for his hospital stay and treatment that totaled approximately $77,000. Campbell and Tomlin Construction did not object to admitting the bills into evidence.
Campbell and Tomlin Construction argue that the amount of the verdict, considered in light of the limited evidence of Kennedy's pain and suffering, reflects that it was flawed. The law is clear, however, that jury verdicts are presumed correct, "especially where damages awarded are for pain and suffering." Coca-Cola Bottling Co. v. Parker, 451 So.2d 786, 788 (Ala. 1984) ; see also Barko Hydraulics, LLC v. Shepherd, 167 So.3d 304, 309 (Ala. 2014) ("[T]he assessment of damages is within the sole province of the jury. This Court will not substitute its judgment for that of the jury and will not disturb a damages award unless the award is the product of bias, prejudice, improper motive or influence or was reached under a mistake of law or in disregard of the facts."). The law is also clear that compensatory damages for pain and suffering cannot be measured by any yardstick, and the amount awarded must be "left to the sound discretion of the jury, subject only to correction by the court for clear abuse or passionate exercise of that discretion." Alabama Power Co. v. Mosley, 294 Ala. 394, 401, 318 So.2d 260, 266 (1975). "A court reviewing a verdict for compensatory damages must determine what amount a jury, in its discretion, may award, viewing the evidence from the plaintiff's perspective." Pitt v. Century II, Inc., 631 So.2d 235, 239 (Ala. 1993). "[A] trial court cannot interfere with a jury verdict merely because it believes the jury gave too little or too much." Daniels v. East Alabama Paving, Inc., 740 So.2d 1033, 1044 (Ala. 1999). Finally, this Court has recognized the presumption that a trial judge, who has the advantage of observing all the parties involved in the trial, including the jury and its reactions, is in a better position to decide whether a verdict is flawed. Daniels, 740 So.2d at 1049. In this case, the trial court provided a well reasoned analysis as to why the jury's verdict was not flawed:
"As an initial matter, in their Motion for Remittitur, [Campbell and Tomlin Construction] do not request a hearing and do not allege any evidence or point to any instance during the trial of misconduct, bias, passionate exercise of discretion, prejudice, abuse, corruption, or other improper motive by this jury affecting the amount of its award--nor is the Court aware of any. Additionally, [Campbell and Tomlin Construction] give no specifics as to how the jury misapplied or misunderstood the law--nor *517 is the Court aware of any. [Campbell and Tomlin Construction] do not point to any misconduct by [Kennedy] or his attorneys during trial leading to the jury's verdict--nor is the Court aware of any. Instead, [Campbell and Tomlin Construction] seem to rely on the amount of the verdict as their cause. However, before addressing this contention, the Court believes it helpful to provide a basis for the denial of remittitur by giving some insight on its view of the jury, attorneys and parties.
"The jury was composed of capable, conscientious men and women who appeared to properly undertake to perform their sworn duty as jurors. Including the alternate, at least nine of the jurors were employed or retired. All but one was in their 50s or 60s. All were older than [Kennedy] and the passengers in the van with him. Because one juror could not be present the last day of trial, the alternate took her place. [Campbell and Tomlin Construction] voiced no objection to any juror. All jurors agreed that they could listen to the evidence and apply the evidence to the law as instructed by the Court which is what was observed. The jurors appeared attentive regardless of the witness or attorney asking questions. The jurors listened to the instructions on the law and followed the correct procedure told to them in asking the Court to reread one of the liability charges. [Campbell and Tomlin Construction] argued liability was the determinative issue, not damages amounts.
"This case was tried by competent counsel. [Kennedy's] counsel complied with motions in limine granted by the Court. [Kennedy's] attorneys, without objection or dispute from [Campbell and Tomlin Construction] as to the amount, placed a value on [Kennedy's] injuries; the jury agreed and awarded the maximum amount requested. During closing arguments, [Campbell and Tomlin Construction] did not challenge the figures presented by Kennedy's attorneys as representing their compensatory damages unlike the issue of liability. [Campbell and Tomlin Construction] did not provide the jury with an alternative to exercising their discretion if they found [Campbell and Tomlin Construction] were negligent. Instead, defense counsel focused on liability asking the jury to not reward [Kennedy] by giving him three million dollars but instead to punish [Kennedy] for allegedly driving too fast, crossing the double yellow line and causing the accident. The other defense counsel asked the jury to 'send a message' and asked them to consider what if it was a school bus filled with children that was turning instead of a motor grader. [Campbell and Tomlin Construction] never addressed the possibility they would lose the liability argument in closing. It seems like a contradiction for [Campbell and Tomlin Construction] to now argue that [Kennedy] did not have a substantial injury to justify all of the jury's award when they did not challenge either the severity or the amount to be awarded during trial.
"Given the absence of any evidence that the jury did anything other than what juries are supposed to do in a case such as this, this Court sees no flaw in the verdict. However, this Court will add that the verdict amount does not shock its conscience or constitute clear jury abuse....
"This is not a subjective injury case. [Kennedy] sustained a significant physical injury. He had a comminuted right femur fracture, a right and left mandibular fracture and a pulmonary contusion. Medical illustrations and medical testimony supported the severity of the *518 injury, the difficulty inserting the rod, having to leave bone fragments in the leg, and having problems with new bone growth many months after surgery. Kennedy was admitted to the hospital seven days. His medical bills totaled $77,111.25.
"[Kennedy and his mother] testified to the severity of [Kennedy's] initial injury, how he recovered and how he has continued to be limited by his leg injury that still causes pain. [Kennedy's mother] explained in some detail how her son's life has changed as a result of the accident. From the Court's observations, the jury could have reasonably believed them. [Kennedy] was not overly sympathetic. Defendants did not challenge the clearly serious injury to his leg or having to eat out of a straw because of his broken jaw. Defendants pointed out that [Kennedy] was convicted of a felony unrelated to this accident. The Court charged the jury on how that conviction may impact [Kennedy's] credibility. Defendants also showed a photograph of [Kennedy] with his shirt off, but that picture did not seem to contradict what he said his current limitations are. However, [Kennedy's] supervisor, who was unimpeached, corroborated what [Kennedy] said about his current limitations.
"The Wendy's manager for whom [Kennedy] was working made an impressive witness. The manager was a well-spoken, professional appearing, non-party witness who described how limited [Kennedy] was with his leg and how those limitations are and will prevent [Kennedy] from standing, walking and doing the physical things necessary to work full time. His credibility as a witness went unchallenged. His testimony was as strong on the issue of damages as Trooper Cleophus Robinson's testimony was on the issue of liability, discrediting a defense theory that skid marks were left by the van and discrediting a defense witness who tried to say that he was an eyewitness.
"Because of the evidence presented as to the severity of [Kennedy's] injuries, his ongoing limitations and pain for which it was reasonable for the jury to conclude will continue the rest of his life, his disfigurement and having to have a rod in his leg where bone fragments were left, the Court cannot say that the jury abused its discretion or misunderstood the law to be applied. As the jury's verdict does not shock the conscience of the Court when considering the evidence presented of those damages, the Motion for Remittitur and for a New Trial are not due to be granted."
(Emphasis added; footnote omitted.) Although Campbell and Tomlin Construction argue that the amount of the jury verdict reflects that the verdict was flawed, they, nonetheless, point to no part of the trial transcript that would suggest that the verdict was the product of "bias, prejudice, improper motive or influence or was reached under a mistake of law or in disregard of the facts." Barko Hydraulics, 167 So.3d at 309. Rather, they merely provide this Court with an analysis of prior cases from this Court, which, they say, involve "far more severe injuries, with more debilitating, and often permanent, lasting damage[ ] and resulting mental anguish" and in which the verdicts were significantly less. However, this Court has stated that, "[i]n the absence of a flawed verdict, ... a comparison of jury verdicts in similar cases is not the standard for determining whether a jury verdict should be reduced." Daniels, 740 So.2d at 1044. The trial court entered a very detailed order finding no flaw in the jury's verdict; Campbell and Tomlin Construction present nothing to *519 undermine that order.[4] Accordingly, because there is nothing in the record to suggest that the jury verdict was flawed, this Court lacks the authority to invade the province of the jury with regard to its compensatory-damages award.
III. Conclusion
Based on the foregoing, the record supports the trial court's denial of Campbell and Tomlin Construction's postjudgment motion for a JML, a new trial, or a remittitur of the compensatory damages. The trial court's judgment is therefore affirmed.
AFFIRMED.
Stuart, C.J., and Bolin, Parker, Main, Wise, Bryan, and Mendheim, JJ., concur.
Shaw, J., recuses himself.

The portion of Highway 43 on which the accident occurred is two lanes separated by a double-yellow line to indicate no passing.

Kennedy also asserted a wantonness claim against both Campbell and Tomlin Construction and a claim of negligent entrustment against Tomlin Construction; however, Kennedy stipulated to the dismissal of those claims, and the trial court dismissed those claims with prejudice.

Tomlin admitted that an older motor grader was also located at the worksite; however, he claimed that that motor grader was not as useful or effective as the 2007 model motor grader involved in the accident.

It is tempting, before reviewing the facts and circumstances in this case, to perform a mathematical analysis of the proportion of the medical bills to the damages award and conclude that the award is disproportionate. But, not only is such a computation not appropriate under our jurisprudence, in this case such an analysis fails to take into consideration not only the evidence of damage, which was virtually uncontroverted, but also the trial court's thorough review of the circumstances surrounding the verdict.